### Carmine GALLUCCI et al.

v.

### Danny HUMBYRD, M.D., et al.

### No. 96–84–Appeal.

Supreme Court of Rhode Island.

April 28, 1998.

Paul S. Cantor, Providence, for Plaintiffs.

Thomas C. Angelone, Jessica L. Papazian–Ross, John A. Baglini, Ruth DiMeglio, William A. Dickie, James A. Currier, Providence, for Defendants.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

Was the testimony of an expert witness erroneously excluded in this medical malpractice case? The trial justice barred certain expert testimony proffered by the plaintiffs, Carmine and Patricia Gallucci, then directed verdicts[1] and entered final judgments in favor of the defendants, Danny Humbyrd, M.D.; Stephen Lucci; Michael J. Infantolino, M.D., d.b.a. Gate Physical Therapy, Sports Medicine and Rehabilitation and Gate Orthopedics. The plaintiffs, who alleged negligent postoperative physical therapy, have appealed those judgments to this Court. For the following reasons, we answer the question in the affirmative and hold that the trial justice erred in excluding the expert testimony, and we reverse the judgments of the Superior Court.

---

1. Effective September 5, 1995, a directed verdict is now designated a judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure.

## Facts and Procedural History

During the summer of 1990, Carmine Gallucci (Gallucci) developed a problem with his right arm for which he consulted defendant Danny Humbyrd (Humbyrd), a medical doctor. Humbyrd diagnosed the problem as a ruptured biceps tendon and advised Gallucci that the injury could be surgically repaired. Gallucci elected to have the surgery, which was performed on September 18, 1990.

While Humbyrd was performing the operation to repair the ruptured biceps tendon, he observed that Gallucci's right rotator cuff was torn.[2] Determining that this problem also required surgical attention, Humbyrd performed that repair along with the repair of the biceps tendon. Both procedures were completed successfully, and Gallucci afterward had no complaints about the surgery itself.

Gallucci saw Humbyrd for a postoperative followup visit on October 3, 1990, at which time Humbyrd prescribed physical therapy to assist in the rehabilitation of Gallucci's arm and shoulder. The next day, Gallucci began a course of therapy at Gate Physical Therapy (Gate), a facility whose offices were housed in the same building as Humbyrd's practice. Stephen Lucci (Lucci), a licensed physical therapist at Gate, was in charge of Gallucci's care.

Humbyrd's written prescription for physical therapy stated that Gallucci was to start with pendulum exercises for one week and then begin "gentle rom [range of motion]" exercises the following week. Gallucci began his therapy at Gate on October 4 and attended additional sessions on October 10, 12, 17 and 19. He failed to show up for a scheduled session on October 22, 1990.

On October 25, Gallucci returned to Humbyrd, complaining of weakness in his arm. Humbyrd's notes from that visit, admitted as evidence at the trial, read as follows:

**2.** The rotator cuff is a set of muscles and tendons that secures the arm to the shoulder joint, enabling rotation of the arm.

**3.** Regarding Gallucci's recollection of whether he experienced this sharp pain on October 31 or November 2, he asserted at trial that the painful episode took place on October 31 and that he did

"Carmine is now having weakness with abduction. He has some atrophy of the deltoid and of the supraspinatus. He has minimal pain, so overall his function is better than it was before, but he is quite concerned about the weakness as I am. At this point, I think that we have no choice but to observe and see him back in four weeks. Continue with therapy. If things do not improve will have to discuss re-exploration on this gentleman. He does not recall any one episode where he suddenly felt his shoulder give way, but I have to be concerned that his rotator cuff has been torn because of this gentleman's aggressive activity level."

On October 29, October 31, and November 2, 1990, Gallucci received physical therapy from Marybeth McGovern (McGovern), a physical therapy assistant at Gate. Lucci, who had anticipated being out of town to attend a professional seminar, had provided McGovern with directions for Gallucci's care. Gallucci used several new machines for the first time on October 31, including the seated row machine and the chest press.

Gallucci testified at trial that he felt a very sharp pain in his shoulder during the October 31 session while working on a chest press and that he was unable to complete the scheduled exercises on the machine. According to his testimony, Gallucci informed McGovern that he could not do any more exercises because of the pain, but he resumed when she called him a "big baby" and told him to continue using the machine. He claimed that he had to stop again shortly thereafter, at which point McGovern finally examined his shoulder. Gallucci asserted that McGovern consulted at that point with Barbara Wendell (Wendell), who was the supervising physical therapist at Gate. According to Gallucci, Wendell told him to "stop everything right there" and directed him to see his doctor.[3]

not perform any exercises during his therapy session at Gate on November 2. In his interrogatories propounded before trial, however, Gallucci averred that "[o]n my last physical therapy visit, I was receiving therapy from a woman when I felt an unbearable stabbing pain during one of those exercises." All parties agree that Gallucci

The testimony of the Gate physical therapists contradicted that of Gallucci. According to McGovern, Gallucci had no problems during his October 31 session and in fact asked McGovern if he could do additional strength-training exercises on the seated row machine after completing the sets that McGovern had instructed him to perform. McGovern testified that she did not allow Gallucci to perform more exercises because she felt he had already done enough for that day. According to McGovern, Gallucci first expressed a complaint on November 2, when he arrived for his therapy session complaining about the appearance of his shoulder. McGovern looked at Gallucci's shoulder and observed that it was "slightly dropped;" she testified that she then consulted Wendell. According to McGovern and Wendell, the therapy given to Gallucci on November 2 included only a hotpack and some isometric exercises. Both therapists denied that Gallucci had been permitted to perform any other exercises after having complained about his shoulder, and both insisted that they advised him at that time to make another appointment with Humbyrd.

A subsequent arthrogram of Gallucci's shoulder showed that the rotator cuff had been retorn. Remedial surgery was performed on Gallucci's shoulder at Massachusetts General Hospital on September 18, 1991, but he did not regain full use of his arm.

On August 26, 1991, Gallucci and his wife, Patricia, filed a complaint in Kent County Superior Court alleging that Humbyrd had failed to provide proper followup care after having operated on Gallucci's shoulder and that Lucci and Gate negligently treated Gallucci during his postoperative physical therapy. The plaintiffs' claims were tried before a jury in Superior Court in June 1995.

At trial, plaintiffs called Barry Lang, M.D. (Lang), an orthopedic surgeon practicing in New Bedford, Massachusetts, as an expert witness. Despite persistent efforts on the part of plaintiffs' attorneys, Lang was never permitted to give a full opinion to the jury on the appropriate standard of care or the causation of Gallucci's injuries. Primarily on

had and kept an appointment at Gate on Novem-

grounds of form and foundation, the trial justice sustained numerous defense objections to questions that plaintiffs' attorneys addressed to Lang; Lang's answers to other questions were stricken on similar grounds. Because of the dearth of remaining expert testimony, the trial justice granted defendants' motions for directed verdicts after plaintiffs rested. This appeal followed.

## Standard of Review

■ The standard of review on a motion for a directed verdict is well settled. Without weighing the evidence or evaluating the credibility of witnesses, the trial justice must consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Hoffman v. McLaughlin Corp.,* 675 A.2d 404, 405 (R.I.1996). "If, after such a review, there remain factual issues upon which reasonable persons might draw different conclusions, the motion for a directed verdict must be denied, and the issues must be submitted to the jury for determination." *DeChristofaro v. Machala,* 685 A.2d 258, 262 (R.I.1996). This Court applies the same standards as the trial court when reviewing the decision of a trial justice on a motion for a directed verdict. *Id.*

## Testimony of Lang

Lang is a board-certified orthopedic surgeon who was called by plaintiffs as an expert witness. The first portions of Lang's testimony were presented in the courtroom before the jury, but owing to problems in accommodating Lang's schedule, the final portion of his testimony was taken by videotaped deposition. Because defendants prevailed on a number of objections and motions to strike segments of the videotaped testimony, significant parts of Lang's testimony were redacted from the videotape and never presented to the jury. The plaintiffs argued on appeal that the substance of this excluded testimony was, when taken as a whole, probative and admissible and that its exclusion was wrong and unfairly prejudicial to their case.

ber 2.

### 1. Foundation for Lang's Testimony

Rule 705 of the Rhode Island Rules of Evidence provides that "[u]nless the court directs otherwise, before testifying in terms of opinion, an expert witness shall be first examined concerning the facts or data upon which the opinion is based." As the Advisory Committee's Note to Rule 705 acknowledges, this Rhode Island rule departs from the federal approach, which permits an expert to give an opinion without first disclosing the underlying facts or data upon which that opinion is based. This Court's directive that "an expert's opinion must be predicated upon facts legally sufficient to form a basis for his [or her] conclusion," *Alterio v. Biltmore Construction Corp.*, 119 R.I. 307, 312, 377 A.2d 237, 240 (1977), was thus preserved with the adoption of the Rules in 1987. *See Gorham v. Public Building Authority of Providence*, 612 A.2d 708, 717 (R.I.1992) (acknowledging continuing authority of *Alterio* standard).

In the case before us, Lang testified that he had reviewed the records of Humbyrd and Lucci, the depositions of Humbyrd and Wendell, the records of Massachusetts General Hospital and those of the surgeon who had performed Gallucci's later corrective surgery, and the records of Gate. Lang also examined Gallucci, reviewed X-rays of his shoulder, and testified that he considered the specific exercises and machines that Gallucci used in therapy and that when formulating his opinion, he took into account Gallucci's October 25, 1990 visit to Humbyrd—including Humbyrd's suspicion at that time that Gallucci's rotator cuff may have been retorn. In light of the substantial nature of his examination and review of patient and records, it is our considered opinion that Lang's testimony established a foundation sufficiently in compliance with Rule 705 to warrant the admission of his expert opinion in full at trial.

Lang opined that Gallucci's therapy using the chest press was a proximate cause of the reinjury to Gallucci's rotator cuff. After defense counsels objected, the trial justice excluded this part of Lang's testimony because it lacked sufficient foundation, and she expressed her concern that Lang was relying on the medical history that had been related to him by Gallucci, which, according to the trial justice, contained facts not in evidence. Specifically, the justice seemed most concerned that Gallucci had told Lang that the weight machines he used at Gate in late October 1990 had been fitted with thirty-pound weights. Lang acknowledged that this information was important to him in formulating his opinion. At trial, however, evidence was offered that Gallucci had used six-pound weights on the machines.[4] When questioned during his videotaped testimony about whether his opinion would change if Gallucci had worked only with six-pound weights, Lang responded that it would not. During questioning by Gallucci's counsel, Lang explained:

"Q. Is the opinion [that using the chest press caused the retear of Gallucci's rotator cuff] you've just described relative to the proximate cause of injury resulting from use of that weight machine dependent on weights of 30 pounds?

"[Attorney for Gate]: Objection.

"[Attorney for Humbyrd]: Objection.

"[Attorney for Gate]: He's already asked and answered it relative to what caused it.

"A. No.

"Q. Would you explain that answer please?

"[Attorney for Humbyrd]: Objection.

"[Attorney for Gate]: Objection.

"A. So long as he was doing active exercise, it really doesn't make any difference how much weight is on the machine. The use of the machine actively is the proximate cause of his rotator cuff tear.

"[Attorney for Gate]: Not responsive, move to strike, and there's no foundation.

"Q. Would the opinion you've just given be the same if six pounds of weight were used on that machine?

"[Attorney for Lucci]: Objection.

---

4. This figure of six pounds was derived from the testimony of McGovern. When he first took the witness stand, Gallucci did not mention the weights on the machines, but he was later recalled and testified that he remembered working with thirty-pound weights. Gallucci's counsel, however, was willing to concede that McGovern's recollection might be more credible.

"[Attorney for Gate]: Objection.

"[Attorney for Humbyrd]: Objection.

"[Attorney for Gate]: No foundation.

"A. It would be the same.

"Q. And what is the basis for that opinion?

"[Attorney for Gate]: Objection.

"[Attorney for Lucci]: Objection.

"A. Again, active exercise with any amount of weight is contraindicated before the rotator cuff is healed.

"Q. When you say 'active exercise,' would you explain to the jury what you mean by that?

"A. Yes. Active exercise is having the muscles contract even against gravity. Just the act of lifting the arm actively with no weight is an active exercise, and that simple act alone is contraindicated until the rotator cuff is healed."

The trial justice determined that the discrepancy between the amount of weight that Gallucci probably used and the amount of weight that Lang initially thought Gallucci had used rendered Lang's opinion inherently unreliable, and thus she did not allow Lang to testify on the effects of Gallucci's physical therapy.

Lang, however, testified repeatedly that the *active exercise* of the chest press, regardless of the weight of the resistance used, was the critical determinant in formulating his opinion that the incorporation of such an exercise into Gallucci's therapy was contraindicated on October 29, 1990, and constituted the proximate cause of the retear of Gallucci's rotator cuff. Although Rule 703 of the Rhode Island Rules of Evidence clearly permits an expert to base an opinion on "a hypothetical question, facts or data perceived by the expert at or before the hearing, or facts or data in evidence," the trial justice apparently feared that Lang's testimony would mislead the jury because Lang had arguably relied on Gallucci's representations about having worked with thirty-pound weights. Any such problems with Lang's opinion, however, go to the weight of his testimony rather than to its admissibility.

Moreover, the trial justice evidently did not believe Gallucci and, by extension, Lang.

But in so doing, she made inappropriate credibility evaluations. Of Gallucci the trial justice stated that she was "troubled by the potential prospect that you got a plaintiff who tells a different story to different people and then * * * when he gets to the Court * * *[he] tells a different story." The trial justice impermissibly weighed the evidence, then excluded Lang's testimony. Clearly, a trial justice serves an important role as the gatekeeper in determining the admissibility of evidence. The obligations of a trial justice acting in such a capacity do not, however, include assessing the credibility of individual witnesses; that responsibility at trial lies exclusively within the province of the trier of facts, in this case, the jury.

This Court will not disturb a trial justice's ruling on the admissibility of expert testimony absent an abuse of discretion. *Frias v. Jurczyk*, 633 A.2d 679, 683 (R.I. 1993); *State v. Capalbo*, 433 A.2d 242, 247 (R.I.1981). It is our opinion that by applying such a narrow and stringent interpretation of the rules of evidence, the trial justice in this case impermissibly conflated her own functions with those of the jury. Although the trial justice technically permitted Lang to testify as an expert witness, she effectively disqualified him by applying an overly rigid standard for the admissibility of individual components of his opinion. Lang is a board-certified orthopedic surgeon, not a charlatan or a purveyor of junk science. His opinion, legally competent as it was, would have been helpful to the jury and should have been admitted. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469, 482 (1993) ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine * * * whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."); Advisory Committee's Note to Rule 702 of the Rhode Island Rules of Evidence ("Rhode Island law and practice on the use of expert testimony is consistent with FRE 702, [which] makes helpfulness to the trier of fact the crucial issue."). Accordingly, we conclude that the trial justice abused her discretion and com-

mitted reversible error when she excluded key sections of Lang's testimony.

## 2. Lang's Testimony Regarding the Standard of Care

The defendants also objected to Lang's testimony on the grounds that he had not testified in respect to the appropriate standards of care that would govern the duties owed to Gallucci by Humbyrd, Lucci, and Gate. Therefore, defendants argued, it would have been improper to allow Lang to testify on defendants' breaches of those standards.

■ This Court has recently abandoned the "same or similar locality" rule for the admissibility of expert testimony in medical malpractice cases. *Sheeley v. Memorial Hospital*, No. 95–602–A, — A.2d — (R.I., filed April 8, 1998). In *Sheeley* we explained that "[a]ny doctor with knowledge of or familiarity with the procedure, acquired through experience, observation, association, or education, is competent to testify concerning the requisite standard of care and whether the care in any given case deviated from that standard." *Id.*, slip op. at 8–9, — A.2d at — – —. In the world of contemporary modern communication, where professionals regularly use a host of sophisticated technologies to exchange information on a national and even global basis, there is no longer any salient reason to adhere to localized standards.

We have also rejected the theory that only an expert whose practice is precisely coextensive with that of the professional defendant can offer an opinion on the relevant standard of care. *See Buja v. Morningstar*, 688 A.2d 817 (R.I.1997) (per curiam) (concluding that obstetrician was qualified to testify as an expert in case alleging malpractice by family practitioner who managed woman's labor and attended delivery of infant that suffered from severe disabilities caused by oxygen deprivation before birth); *Marshall v. Medical Associates of Rhode Island, Inc.*, 677 A.2d 425 (R.I.1996) (per curiam) (concluding that board-certified pediatrician who had expertise in treatment of animal-bite wounds was qualified to testify as expert witness in case alleging negligent treatment of animal-bite wound by emergency room physician).

Our examination of the record revealed that on several occasions Lang either testified or attempted to testify on the appropriate standard of care, only to have his testimony stricken or precluded by successful defense objections. For example, he stated,

"The problem with continuing physical therapy in light of the complaints of the patient and the physical findings is that if there is the possibility that the rotator cuff re-ruptured, further physical therapy would further injure that area and not allow it to heal. *The proper course of treatment would be to make that diagnosis to let the patient rest the arm, to see if there is any recovery with rest.* If there were recovery with the rest, physical therapy could be continued." (Emphasis added.)

During his videotaped testimony, Lang was asked to explain "the standard of care which applied to Dr. Humbyrd's follow-up care of Mr. Gallucci following the 9/18/90 surgery." His response was that

"[t]he standard of orthopedic care would be to write a prescription for physical therapy to make it specific enough for the physical therapist to understand explicitly the treatment necessary for the patient's problem and/or to discuss it with the physical therapist and to continue following the patient while the patient is in physical therapy, not on a daily basis, but at appropriate intervals."

In respect to the applicable standard of medical care that applied to Humbyrd's treatment of Gallucci following Gallucci's exam on October 25, Lang stated that "[t]he standard should be to stop physical therapy at that time to rest the shoulder; or at the very least if physical therapy were to continue, to use passive range of motion only and certainly not active exercises."

■ It is our opinion that these statements by Lang adequately articulated a standard of care, and consequently, the trial justice abused her discretion in not allowing this evidence to be presented to the jury.

A review of the record revealed that the trial was vigorously argued by the five attorneys representing the parties. The record is replete with examples of plaintiffs' lawyers repeatedly being required, following defendants' objections to the forms of questions, to reconstruct their questions, each time changing or shifting one word until a permutation was reached that would result in the entry of another small piece of evidence. For example, the trial justice sustained defendants' objection to the form of the following question posed to Lang:

> "Okay, Doctor, based on your education, skill and expertise in the field of orthopedic surgery and in a similar locality, do you have an opinion based on a reasonable degree of medical certainty as to whether or not there was a departure in the acceptable standard of orthopedic surgical care in prescribing to continue physical therapy of Mr. Gallucci on October 25 of [1990]?"

The trial justice finally overruled defendants' objection to form after the question's *fifth* incarnation:

> "Doctor, based on your education, your skill and your experience in the field of orthopedic surgery, do you have an opinion based on a reasonable degree of medical certainty as to whether or not there was a departure in the acceptable standard of care in similar localities in October of 1990 regarding the continuation of the physical therapy by Dr. Humbyrd back on October 25, [1990]?"

Such an exercise exalts form over substance. Trial advocacy, although undoubtedly an ancient art, is not alchemy. There are no magic words. We reject the notion that lawyers and their expert witnesses must recite precisely constructed talismanic incantations. Nor must they rigidly conform their words to those of prior successful witnesses in order to present expert opinions as evidence. Such outcomes are evocative of the pitfalls of the common law pleadings in which failure to select the correct theory of liability and the proper procedure or form of action resulted in total rejection of the party's substantive claim.

The modern rules of evidence are intended to facilitate and to preserve the integrity of the factfinding process, not to create a labyrinth in which judge and jury lose the thread of proffered testimony instead of arriving at fair and accurate determinations of the ultimate facts in issue. It would be the most unfortunate of ironies if the very rules that were designed to correct the "empty rhetoric" and "odd verbal circumlocutions" of an earlier era were to become the framework for a similarly obfuscatory jurisprudence. *See* Advisory Committee's Note to Rule 704. To the extent that our case law prior to 1987 may be misleading in suggesting a preference for formulaic or ritualistic lines of inquiry, those earlier cases are trumped by our adoption of the Rules of Evidence in 1987.

### Motion for Directed Verdicts

Because we have concluded that Lang's testimony was wrongfully excluded, we hold that the trial justice erred in granting the defendants' motions for directed verdicts. Lang was prepared to testify on the applicable standards for the duty of care owed by Humbyrd to Gallucci[5] and on the question of whether the physical therapy Gallucci received at Gate was a proximate cause of his injury. Had Lang's testimony been admitted, significant questions of fact would have remained for the jury's determination, thus precluding the directed verdicts and the entry of final judgments in favor of the defendants.

Accordingly, we sustain the plaintiffs' appeal and vacate the judgments of the Superior Court. The papers in this case are remanded to the Superior Court for a new trial in accordance with this opinion.

---

**5.** Evidence of the relevant standard of care with respect to the physical therapists was presented by plaintiffs' expert physical therapist, Debra Shenton, and by McGovern.