STATE

v.

Shane M. GASPAR.

No. 2007–44–C.A.

Supreme Court of Rhode Island.

Oct. 30, 2009.

Lauren S. Zurier, Department of Attorney General, for Plaintiff.

John A. MacFadyen, Esq., Providence, for Defendant.

Present: GOLDBERG, Acting C.J., FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## OPINION

Justice SUTTELL, for the Court.

The evidence adduced at the trial of this criminal case included testimony concerning a multitude of unconventional sexual practices but ultimately presented only one question for the jury's determination: did the events of the night in question constitute a mutually consensual sexual encounter between two adults or a brutal sexual assault?

The defendant, Shane M. Gaspar, appeals from a Superior Court judgment of conviction on five counts of first-degree sexual assault resulting from events that unfolded on November 8, 2003. On appeal, defendant argues for reversal of his conviction on three grounds. He contends that the trial justice committed prejudicial error by (1) permitting the state to introduce under Rule 404(b) of the Rhode Island Rules of Evidence the testimony of another woman who previously had a consensual sexual relationship with defendant, (2) allowing the state to introduce the complaining witness's hearsay statements contained in a report prepared by an emergency room physician, and (3) permitting the state's medical expert to offer an opinion about the approximate age of the complaining witness's bruising without providing any foundation for her opinion. For the reasons stated in this opinion, we vacate the judgment of the Superior Court.

## I

### Facts and Procedural History

Generally, the facts leading up to the night in question are not in dispute. In early 2003, both defendant and the complaining witness, Sally Smith,[1] frequented a local Providence chat room on the internet. At some point, using an internet

1. We identify the complaining witness by use of a pseudonym.

"screen name" of "IrishFriend," Ms. Smith struck up an instant message (IM)[2] conversation with defendant, who was using the screen name "OCEANBENZ1," asking if he drove a Mercedes Benz. They began conversing on a regular basis over the internet, finally agreeing to meet in person.

Before the night of the alleged sexual assault, defendant and Ms. Smith had maintained regular contact over the internet for a period of many months, and they previously had met each other on three separate occasions. Before they ever met in person, Ms. Smith learned from chatting with OCEANBENZ1 that his real name was Shane Gaspar, that he was originally from Warwick, and that he owned a restaurant in Fall River. They initially met in the spring of 2003 at the Mudville Pub in Newport around 9 p.m. on a Sunday night. On that occasion, they each had one beer and talked for about an hour before taking a walk in a park under the Newport bridge. They met a second time in July 2003, when defendant brought coffee to Ms. Smith at her apartment before she left for work. That morning they had a casual conversation, and defendant stayed less than an hour. Both individuals testified that no physical contact or discussions of a sexual nature occurred during these first encounters. Ms. Smith testified that defendant came across as "very nice," "quiet," and "kind of reserved."

They met again in September 2003, at Ms. Smith's apartment, when defendant again brought over coffee in the morning. This time, however, a "pleasant" conversation led to consensual coitus. Ms. Smith described their sexual encounter as "normal," a "quickie," and she testified that they used a condom. It is at this juncture that the parties' accounts of what happened between them begin to diverge. The defendant testified that he saw bruising on Ms. Smith's body, particularly her buttocks, and asked her about it. According to defendant, she told him that she "had been a bad bad girl" and had started experimenting with sadomasochism and bondage during a recent trip to California. The defendant said that, although they had never discussed the topic of "rough sex" before, there had been some indication of this interest on her part in previous instant messages that she sent him. Ms. Smith testified that they may have discussed her recent trip to California but denied ever seeking or being involved in a "rough sex" relationship.

Five or six weeks passed after their September encounter without Ms. Smith hearing from defendant. They met again, however, on November 8, 2003, an encounter both parties agreed was precipitated by instant messaging. Ms. Smith testified that defendant instant messaged her around 3 p.m., telling her he missed her and missed having sex with her. When defendant asked if he could come over to her apartment that night, she agreed. She testified that she may have told him she "like[d] to be spanked." She described their exchange as being "just kind of like the other conversations," though they had never before "said anything about spanking." She told the grand jury, however, that their conversation was very flirtatious and that they talked about "rough sex." In a written statement Ms.

**2.** Instant messaging is a form of real-time communication between two or more people by means of the internet using typed text. *See Wisniewski v. Board of Education of Weedsport Central School District* 494 F.3d 34, 35 (2d Cir.2007). In a chat room, where the messaging is "public" or visible to anyone who enters, an instant message allows private dialogue unseen by others. *See United States v. Dwinells,* 508 F.3d 63, 66 (1st Cir.2007); *State v. Lacasse,* 153 N.H. 670, 917 A.2d 184, 185 (2006).

Smith gave to police, she wrote, "[w]e talked about sexual fantasy and rough sex online." She maintained at trial, however, that their internet conversation on November 8, 2003, did not include an agreement to engage in "rough sex" later that evening.

In any event, they agreed to meet that night, and defendant arrived at Ms. Smith's apartment around 9 p.m. Ms. Smith testified that, during what amounted to at least an hour-long conversation on the living room couch, defendant told her that, in the five or six weeks that they had not communicated, he had moved in with a woman but subsequently left because she proved to be a sex addict. The defendant testified that Ms. Smith again told him about her travels to California and her experimentation with a sadomasochistic lifestyle. He told the jury that he saw marks and bruises on her arms and legs, although Ms. Smith testified that she was wearing full-length pants and a sweater that evening. The defendant stated that he was not interested in that lifestyle, although he "wasn't judgmental about her at all." Eventually, they repaired to the bedroom. From there, the parties have wildly divergent—though equally graphic—accounts of what transpired. Ms. Smith described a brutally violent sexual assault that came as a complete surprise to her, whereas defendant recounted an evening of unorthodox, but consensual, sexual activity. We relate only the essential aspects of their contradictory testimony so as to omit its more lurid details.

Ms. Smith testified to a horrific series of events that began when defendant slapped her across the face, grabbed her hair, and put his fingers down her throat, causing her to gag. She said that she asked him to stop; and, when she told him she was going to vomit, he said, "I like puke, bitch." She then testified that defendant started to choke her, spit into her mouth and face, forced her to perform fellatio three times, once while she was sitting on the bathroom toilet, had vaginal intercourse with her twice and anal intercourse once, performed cunnilingus on her, and penetrated her with his fist on two occasions, causing her intense and excruciating pain. She further testified that throughout this ordeal defendant was controlling her by pulling her roughly by the hair, all the while slapping and biting her breasts, and uttering crude and degrading epithets.

Ms. Smith testified that, in the time since they had originally entered the bedroom, at least an hour and a half passed. She stated that she fought him as much as she could for at least an hour. She said they then lay on the bed while she devised a strategy to get him to leave her apartment. She suggested that she go with him to his restaurant and give him oral sex in the car. The defendant agreed to leave, but he told her he did not want her to accompany him. She testified that he then got up, dressed, and left the apartment; she locked the door behind him.

The defendant recounted a very different version of what transpired in Ms. Smith's apartment that night. He testified that when they were talking on the couch, she told him she wanted to teach him about her new lifestyle and made "all sorts of S & M sort of related comments." According to Mr. Gaspar, when they undressed, he saw fresh injuries already on her buttocks, breasts, shoulders, and legs. Although he testified that "S & M has never been anything I was interested in," he nonetheless complied with her requests. He said that, at her insistence, he called her names, bit her, and slapped her. He said that he was not able to bite her as hard as she desired because of four false front teeth, causing her to call him a wimp. He testified that they engaged in consen-

sual foreplay, fellatio, and coitus. The foreplay included digital stimulation and non-aggressive spitting as a form of lubrication, but he denied penetrating her vaginally with his fist.[3] The act of fellatio in the bathroom, he said, was a sexual fantasy of Ms. Smith's, and she was insistent that they do it. He said that the only time he held her hair was when she asked him to do so and that he never pulled or dragged her forcefully by her hair. Ms. Smith neither screamed nor cried, he said, nor told him "no." He told the jury that he did not force her into any sexual act and that their activities that night were entirely consensual.

The defendant agreed with Ms. Smith that their activities lasted approximately an hour and a half and that he left her apartment to return to his restaurant that night. He said, however, that they spent some time lying on the bed and opened a window to "look[ ] up at the stars." When he told her that he needed to leave, she offered to go with him so he could come back and stay the night, even offering him oral sex as an incentive. He said that he turned down her offer because he wanted to avoid driving from West Warwick to Fall River and back again, but he would call her in the morning.

Ms. Smith testified that after defendant left that night, she immediately brushed her teeth, took some aspirin, and examined herself in the mirror. She then called 911. Before the police arrived, she straightened up her apartment—throwing away beer cans and an unopened condom defendant had brought over. She changed clothes so that she could turn over the clothing she was wearing that night to the police, but she nevertheless put on the same set of undergarments.

Patrolman Don Archibald was first to arrive at her apartment. When Ms. Smith declined an ambulance, the officer drove her to Women & Infants Hospital. At the hospital, Valerie Swiatkowski, M.D., a second-year resident, performed a standardized examination for an alleged sexual assault. Doctor Swiatkowski discovered abrasions on Ms. Smith's labia majora and minora and a laceration on her perineum (the area between the vaginal opening and anus) that was still bleeding. The doctor testified that the other times she had seen women with similar lacerations to the perineum, they had occurred during childbirth. While at the hospital, Captain Catherine Ochs of the West Warwick Police Department took photographs of the bruises and marks on Ms. Smith's body, and Ms. Smith gave an oral statement to Officer Archibald. Ms. Smith testified at trial that, at that time, she did not disclose everything she knew about Mr. Gaspar—telling the police only his first name, his physical description, that they met on the internet, and what happened to her that night.[4]

Meanwhile, police inspected her apartment as part of their investigation. When they requested permission to seize her computer, she did not grant it, instead giving them her password so they could have access to her computer that night. An officer from the West Warwick Bureau of Criminal Identification testified that a search of Ms. Smith's computer revealed

---

**3.** Mr. Gaspar later testified that "fisting," as a sexual act, requires lubrication and is a "process" that requires "preparation." He said that "fisting" cannot be done forcibly without seriously hurting an individual.

**4.** Ms. Smith did not inform them that she knew his last name, cell phone number, place of business, and make of car; she also did not disclose their previous consensual intercourse. She gave the jury a number of reasons for limiting her disclosure, including a chaotic hospital environment, emotional trauma and shock, and embarrassment.

eight or nine websites saved to a list of favorites, including one called "Boston Dungeon" and another titled "New England Dungeon."[5] The police seized a steno notebook that she kept near her computer, in which Ms. Smith kept quotes, such as "I love submissive people,"[6] and listed a number of screen names, either hers or her friends', including the screen name "NE Submissive." Police investigators found several indications of the presence of bodily and seminal fluid using an alternative light source, seizing various items for forensic testing. Sergeant Keith Azverde explained that they did not request that the seminal fluid be matched to any particular person because "the identity of the male party was no longer an issue; the issue was more consent." A forensic scientist at the Rhode Island Department of Health received a sexual assault kit from Women & Infants Hospital and a number of items seized from Ms. Smith's apartment. An analysis found seminal fluid in the oral samples collected from Ms. Smith, but not from the vaginal or rectal samples; it also revealed seminal fluid on the bedding from Ms. Smith's apartment, but not on any other items seized.

A police officer drove Ms. Smith home from the hospital around 9:30 a.m. on November 9, 2003. A day or two later, the complaining witness went to the police station, where she disclosed the information she previously withheld. Captain Ochs also took additional photographs of Ms. Smith to show the progression of the bruising. She opined at trial that the bruising proceeded as expected, although she could not say from her observations when the bruising actually occurred.

Subsequently, Mr. Gaspar was charged by indictment with six counts of first-degree sexual assault, all arising out of the same sexual encounter. The case was tried twice before the same trial justice. A deadlocked jury in the first trial resulted in a mistrial. The case was tried a second time on February 28, 2006. On March 7, 2006, the jury returned a guilty verdict on five of the six counts. The trial justice heard and denied defendant's motion for new trial on May 9, 2006. On May 12, 2006, defendant was sentenced to fifty years imprisonment on each count, terms to run concurrently, with twenty-five years to serve, and the balance suspended with the statutory conditions of sex offender registration and counseling.

The defendant bases his appeal on the trial testimony of two state witnesses, Jane Doe,[7] a former girlfriend of defendant, and Dr. Swiatkowski, who examined Ms. Smith at Women & Infants Hospital. We discuss the substance of this testimony below, in the context of the three evidentiary issues raised on appeal.

## II

### Analysis

#### A

#### Testimony of Defendant's Former Girlfriend

At Mr. Gaspar's first trial, his former girlfriend, Jane Doe, testified as a rebuttal

---

**5.** Ms. Smith testified that a friend who was visiting showed her these websites, and she never visited them again. Despite her admittedly avid use of the internet, she said that she "didn't even know there was a favorite thing that you could have."

**6.** Ms. Smith testified that she wrote down some of the things people said in chat rooms that she visited for a potential book.

**7.** We refer to defendant's former girlfriend pseudonymously in deference to her minor child.

witness for the state.[8] At his second trial, the prosecution called Ms. Doe to testify as part of its case-in-chief. She testified that she began a relationship with Mr. Gaspar around February 2003, which relationship lasted eight or nine months. They met online when defendant sent her an instant message with sexual overtones. For a period, Mr. Gaspar moved in with Ms. Doe and her four-year-old daughter. They separated, however, in the fall of 2003, some time before Thanksgiving.

Ms. Doe stated that, from the outset of their relationship, she and defendant had engaged in "rough or aggressive sex" on an almost daily basis. She freely admitted that she enjoyed aggressive sex and that this was their exclusive form of sexual encounter. Before the jury, she described in explicit detail the various sexual activities in which she willingly participated with defendant. She said that defendant would put his fingers deep into her mouth, because he liked to make her gag and whimper. He also spit on her and in her mouth, put his whole fist into her vagina, and engaged in anal sex.[9] According to Ms. Doe, defendant was never affectionate or non-aggressive during their sexual encounters, and he progressively became more aggressive over time. At some point, they developed a "safety word,"[10] which would signal when it was time to stop. Ms. Doe said she only had occasion to use their safety word once or twice, but that defendant did not honor it, and it "seemed to egg him on" instead.

The state also elicited from Ms. Doe that on five occasions she and Mr. Gaspar had consensual sex together with other women: so-called "threesomes." All of these women were in their forties and all but one was overweight. Ms. Doe, herself aged twenty-nine, asserted that defendant engaged in the same sort of rough or aggressive actions during their forays into menage a trois.

Additionally, Ms. Doe was asked on redirect examination to read from an anonymous e-mail she had sent to the Office of the Attorney General before she agreed to testify as a witness. In her e-mail, she stated that she did not want to become involved in this case unless it was likely that Mr. Gaspar would be acquitted. Although she acknowledged on the stand and in her e-mail that her sexual relationship with defendant was consensual, she read to the jury a portion of her e-mail bemoaning the circumstances of the complaining witness and professing remorse that neither she nor defendant's other sexual partners had come forward previously.

On appeal, defendant argues that the trial justice committed prejudicial error when she allowed the state to introduce the testimony of Jane Doe under Rule 404(b). The defendant gives three reasons why the admission of this evidence was prejudicial error. First, defendant contends that Ms. Doe's testimony about defendant's prior sexual acts did not have the "special relevance" necessary for admission of "prior bad acts" under Rule 404(b).

---

8. Although the transcript from the first trial is not in the record, it appears that Mr. Gaspar testified during both trials that he had no interest in sadomasochistic or aggressive sex. At the first trial, Ms. Doe impeached this assertion when she testified that she and Mr. Gaspar had a consensual sexual relationship that was rough and aggressive.

9. Nothing in Ms. Doe's testimony indicated that she and defendant engaged in choking, biting, or slapping during intercourse.

10. Ms. Doe explained that a safety word is "a word that [does not] make sense in any sexual situation" and "should act as a kind of turn off." Theirs was "cheeseburger." She said it indicates to a person that they are doing something wrong, and it is time to stop.

Instead, because Ms. Doe testified about consensual sexual activities in a case in which the state was required to prove force or coercion, defendant argues the testimony showed only that he had a particular character trait (*viz.,* interest in rough and aggressive sex). Thus, defendant asserts that the state asked the jury to draw the very inference specifically prohibited by Rule 404(a)—that defendant acted in conformance with that trait on November 8, 2003. Second, defendant argues that "the state unfairly exploited this evidence by maximizing its sensationalist potential by grafting onto it inflammatory descriptions of three-way sex." Finally, defendant avers that the trial justice's limiting instruction was "woefully insufficient."

The state argues that the trial justice did not err in admitting evidence concerning defendant's previous sexual conduct because the evidence was relevant and reasonably necessary to negate defendant's consent defense. Specifically, the state argues that defendant's position at his first trial—in which he allegedly portrayed Ms. Smith as the person with sadomasochistic proclivities and himself as a reluctant participant—made Ms. Doe's testimony relevant "to contradict defendant's position, and thereby undercut his defense." The state further contends that Ms. Doe's testimony about aggressive group sex with middle-aged, overweight women whom defendant met on the internet "was admissible under the common plan/scheme and motive exceptions to [Rule] 404(b) in order to demonstrate that * * * [defendant] not only had an ongoing interest in having aggressive sex with women like [Ms. Smith], but used the Internet as the means

by which to meet such women." Additionally, the state points out that Ms. Doe's testimony about defendant's failure to honor their safety word on one or two occasions was admissible under Rule 404(b) to demonstrate absence of mistake concerning non-consent. The state professes that the "deadlocking of the jury in the first trial" meant that the state "may have been unable to sustain its burden of proof without the introduction of the [Rule] 404(b) evidence." Finally, the state argues that the trial justice's limiting instruction to the jury was adequate but that, even if it was not, defendant waived this issue by failing to object.[11]

### 1. Standard of Review

 It is well established that decisions concerning the admissibility of evidence are "within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent." *State v. Mohapatra,* 880 A.2d 802, 805 (R.I.2005) (quoting *State v. Grayhurst,* 852 A.2d 491, 504 (R.I.2004)).

### 2. Discussion

 It is not necessary for us to decide whether Ms. Doe's testimony was properly admitted at the second trial based on the criteria set forth in Rule 404(b) because we are persuaded that her testimony should have been barred under Rule 403 of the Rhode Island Rules of Evidence. Rule 403 provides:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations

---

11. Because we vacate the judgment of conviction on grounds that Ms. Doe's testimony about a consensual relationship was inadmissible under Rule 403 of the Rhode Island Rules of Evidence, we decline to address the sufficiency of the trial justice's limiting instruction.

of undue delay, waste of time, or needless presentation of cumulative evidence."

Rule 403 cuts across the rules of evidence and is always a consideration in a trial justice's ruling on the admissibility of Rule 404(b) evidence. *See, e.g., State v. John*, 881 A.2d 920, 927 n. 14 (R.I.2005) ("In addition to the protections afforded by Rule 403, we have required that, in applying Rule 404(b), 'the trial justice must carefully weigh the probative value of the evidence against the danger of unfair prejudice * * *.' ") (quoting *State v. Pratt*, 641 A.2d 732, 742 (R.I.1994)); *State v. Hopkins*, 698 A.2d 183, 186 (R.I.1997) ("In deciding whether to allow the jury to hear this type of [Rule] 404(b) evidence, the trial justice has to balance relevance against remoteness and the potential for improper prejudicial impact."). Similar approaches have been endorsed by the federal courts applying the substantially analogous Federal Rules of Evidence 403 and 404(b). *See, e.g., Huddleston v. United States*, 485 U.S. 681, 688, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) (noting that evidence properly offered under Rule 404(b) of the Federal Rules of Evidence "is subject only to general strictures limiting admissibility such as Rules 402 and 403."); *United States v. Varoudakis*, 233 F.3d 113, 121 (1st Cir.2000) ("Prior bad act evidence that surmounts the bar of Rule 404(b) may still be inadmissible under Rule 403.").

Indeed, some jurisdictions have highlighted the interplay of these two rules by explicitly adopting two-step analyses of Rule 404(b) evidence. *See, e.g., Varoudakis*, 233 F.3d at 118 ("To admit evidence of prior bad acts, a trial court must find that the evidence passes two tests. First, the evidence must have 'special relevance' to an issue in the case such as intent or

knowledge, and must not include 'bad character or propensity as a necessary link in the inferential chain.' * * * Second, under Rule 403, evidence that is specially relevant may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.") (quoting *United States v. Frankhauser*, 80 F.3d 641, 648 (1st Cir.1996)); *see also United States v. Beechum*, 582 F.2d 898, 911 (5th Cir.1978) ("What [Rule 404(b)] calls for is essentially a two-step test. First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of [R]ule 403."); *see generally Rule 404(b) Other Crimes Evidence: The Need For a Two–Step Analysis*, 71 Nw. U.L.Rev. 635, 640 (1976) ("[D]eciding the admissibility of evidence of other crimes under [R]ule 404(b) is merely one step in determining whether the jury will be allowed to hear the evidence. Like any other relevant evidence, the probative value of other crimes information still must be weighed by the criteria of [R]ule 403, which excludes unfair or confusing evidence.").

The decision to exclude evidence pursuant to Rule 403 is confided to the sound discretion of the trial justice. *State v. Martinez*, 824 A.2d 443, 449 (R.I.2003). We review the trial justice's decision for clear abuse of discretion. *State v. DeJesus*, 947 A.2d 873, 883 (R.I.2008).

Assuming, without deciding, that Ms. Doe's testimony was admissible under one of the exceptions to the general exclusionary provisions of Rule 404(b), we hold that the trial justice erred in admitting this unfairly prejudicial evidence.[12] Whatever

---

**12.** We stress that this evidence was *unfairly* prejudicial because most evidence offered at

the probative value of Ms. Doe's testimony, its utility was clearly outweighed by the danger that it would confuse, mislead, and unfairly prejudice the jury.

In the case at bar, the sole issue for the jury was whether defendant acted with force or coercion, or, as defendant contended, whether the sexual encounter was consensual. As part of its case-in-chief,[13] the state presented the testimony of Ms. Doe, who recounted an eight-or nine-month relationship with defendant involving rough or aggressive sexual activity on an almost daily basis. With the exception of only one or two occasions when, according to Ms. Doe, defendant failed to heed their safety word, the sexual encounters were entirely consensual. We are satisfied that the implied equivalence of defendant's consensual and alleged nonconsensual sexual encounters (with Ms. Doe and Ms. Smith respectively) was very likely to confuse the jury and invite an emotional response. We conclude, therefore, that the

trial justice committed reversible error in admitting this evidence.

## B

### Admission of Medical Report Narrative

The defendant next assigns as prejudicial error the admission into evidence of the portion of the medical records that contain an historical narrative of the evening's events as related by the complaining witness. He particularly challenges the trial justice's ruling that allowed the doctor to read the narrative to the jury during her testimony, thereby imbuing it with her professional imprimatur. Doctor Swiatkowski, who examined Ms. Smith in the early morning of November 9, 2003, testified that she followed a standard protocol for evaluating a patient for an alleged sexual assault. The state requested that she read the contents of a portion of her documentation titled "medical summary of al-

---

trial is inherently prejudicial. Only *unfairly* prejudicial evidence is barred under Rule 403—meaning evidence that has "an undue tendency to suggest a decision on an improper basis[,]" and "appeals to the jurors' sympathies, arouses their sense of horror, provokes their instinct to punish, or otherwise causes a jury to base its decision on something other than the established propositions in the case." 29 Am.Jur.2d *Evidence* § 338 at 360 (2008).

13. According to the state, at his first trial, defendant "depicted himself as a reluctant participant who found what [Ms. Smith] was telling him to do personally distasteful and who himself had never engaged in these practices before." At the first trial, the state presented Ms. Doe as a rebuttal witness to impeach that testimony by defendant. At the second trial, the state presented Ms. Doe as part of its case-in-chief. On appeal, the state asserts that Ms. Doe's testimony at the second trial "was presented to contradict defendant's position, and thereby undercut his defense" of consent.

Despite its purported Rule 404(b) rationale, in essence the state is suggesting that Ms.

Doe's testimony was presented as part of its case-in-chief to impeach defendant's anticipated testimony. Rule 404(b) does not govern the introduction of impeachment evidence. There are various other evidentiary rules that govern impeachment. *See, e.g.,* R.I. R. Evid. 607–609. Specifically, Rule 607 provides that "[t]he credibility of a *witness* may be attacked." (Emphasis added.) When the state presented Ms. Doe on direct, defendant was not yet a witness at trial, and thus his anticipated consent defense could not yet be impeached. In a criminal matter, a defendant has no burden of proof and may choose not to testify at any time. *See State v. Alston,* 900 A.2d 1212, 1221 (R.I.2006); *State v. Hallenbeck,* 878 A.2d 992, 1007–08 (R.I.2005). Thus, impeachment in this form was improper during the state's case-in-chief and significantly increased the risk of unfair prejudice to defendant. Because Ms. Doe's testimony was elicited as part of the state's case-in-chief, we need not consider whether some or all of her testimony would have been properly admissible in rebuttal; that would depend on what defendant testified to—if indeed he chose to testify.

leged assault." [14] Doctor Swiatkowski stated that she gathered information about the assault for purposes of medical diagnosis and treatment, and proceeded to read into the record the narrative that she had taken from the complaining witness that night. This report repeated, at times verbatim, the criminal accusations of the complaining witness:

"[Doctor Swiatkowski]: Okay. 'The patient invited the acquaintance into her home and into her bedroom. Patient originally was consensual, but after approximately three minutes, she told the man, "No." He became abusive, yelling at her, pulling her hair. He did not stop. He bit her over multiple spots on her body, the shoulders, back, arms, and legs, forced fellatio on her, pulling her hair and told her, "You like it, bitch." He then raped her both vaginally and anally several times. He told her she "had not made me cum." During this time period, he held her down at times by her arms and her hair, hit her on the breasts, arms, legs. At several points, she tried to get away, but he pulled her hair harder. She told him she had to go to the bathroom, so he dragged her from the bedroom to the bathroom. She urinated after he forced her to sit on the toilet and provide oral sex to him again. He then pulled her into the living room by her hair and eventually pushed her onto the floor. He again raped her both vaginally and anally. He also forced his fist into her vagina. She screamed that it hurt and to stop. He again told her— he told her she, "liked it, bitch." She noted vaginal pain and bleeding afterwards. He again forced fellatio on her; and during one of the episodes, he ejaculated into her mouth. She spit out the semen. She is unsure if he came during vaginal or anal intercourse. He brought her back into the bedroom, all the while continued biting her, hitting her, and pulling her hair. Eventually, he got dressed and left. She got up and brushed her teeth. She then called 9–1–1, and the police came and brought her here with the clothing she had on the night or on before the encounter [sic]. Her underwear were the same ones she wore when she got here. They have been collected as evidence. The patient relates a time period to be 10 to 12 p.m. on 11–8. She arrived at Women & Infants Hospital with the police at 2:50 a.m. on 11–9.'"

On appeal, defendant argues that the trial justice committed prejudicial error when she permitted the introduction of those portions of the medical records that contained the hearsay narrative from the complaining witness. The defendant argues that this testimony falls squarely within a line of cases applying this Court's pronouncement in *State v. Pina*, 455 A.2d 313, 315 (R.I.1983), that under the hearsay exception for medical diagnosis and treatment, statements that ascribe fault or are otherwise not a basis for diagnosis or treatment should be excluded. *See* R.I. R. Evid. 803(4). The defendant contends that Dr. Swiatkowski's testimony was "replete with accusations of criminal behavior, [and] with assertions that the complaining witness had not acted consensually[;]" he further contends that the report was gathered for law enforcement purposes, not medical purposes. Additionally, defendant argues that the testimony in this case was much more graphic and pointed in its accusations of criminal behavior than those previously considered and excluded by this

14. The entire medical report of Women & Infants Hospital had been admitted into evidence by agreement, although defendant objected to the introduction of the narrative portion.

Court and that to allow its admission would require overruling an entire assemblage of case law. Finally, defendant maintains that this testimony was especially prejudicial because of its suggested "seal of professional approval."

The state counters that "the majority of the statements in the narrative portion of [the medical report], as read at trial by Dr. Swiatkowski," were pertinent to Ms. Smith's diagnosis and treatment for sexual assault, and that the doctor so testified at trial. The state contends that, to the extent any statements fell outside the scope of Rule 803(4), the admission was harmless because the jury heard the same testimony from Ms. Smith herself and the doctor did not comment on the report's veracity.

### 1. Standard of Review

■ "It is well established that 'the admission of a statement under an exception to the hearsay rule is within the sound discretion of the trial justice and shall not be overturned unless clearly erroneous.'" *State v. Bergevine*, 942 A.2d 974, 978 (R.I. 2008) (quoting *State v. Ruffner*, 911 A.2d 680, 689 (R.I.2006)).

### 2. Rule of Evidence 803(4)

Doctor Swiatkowski's testimony relaying Ms. Smith's medical summary report is clearly hearsay. *See* R.I. R. Evid. 801(c). Rhode Island, however, recognizes the medical-diagnosis exception to the hearsay rule. Rule 803(4); [15] *see In re Andrey G.*, 796 A.2d 452, 456 (R.I.2002); *State v. Contreras*, 105 R.I. 523, 534–35, 253 A.2d 612, 619 (1969). The rationale behind this rule is that "a person will presumably be

truthful to a physician from whom he expects to receive medical attention." *Pina*, 455 A.2d at 315; *see* Rule 803(4), Advisory Committee's Note; *State v. Lima*, 546 A.2d 770, 774 (R.I.1988). Thus, statements made by an injured individual to his treating physician relating to his physical condition and to the cause of such injury are generally admissible. *Pina*, 455 A.2d at 315.

■ The test for determining admissibility "hinge[s] on whether what has been related by the patient will assist or is helpful in the diagnosis or treatment of [the patient's] ailment." *In re Andrey G.*, 796 A.2d at 456 (quoting *In re Jessica C.*, 690 A.2d 1357, 1363 (R.I.1997)); *see Contreras*, 105 R.I. at 534–35, 253 A.2d at 619. Statements that narrate details unconnected with either diagnosis or treatment, however, are inadmissible unless they fall under another hearsay exception. *Pina*, 455 A.2d at 315; *State v. Veluzat*, 578 A.2d 93, 96 (R.I.1990). When statements about causation enter the realm of assigning fault, it is unlikely that the patient or the physician consider them related to diagnosis or treatment. *Pina*, 455 A.2d at 315. "In the circumstances where fault is an issue, statements of causation do not hold the same reliability of truthfulness and are properly excluded." *Id.* An uninterrupted line of cases from this Court has followed the rule elucidated in *Pina* in applying Rule 803(4). *See In re Andrey G.*, 796 A.2d at 456; *Veluzat*, 578 A.2d at 96; *Lima*, 546 A.2d at 774; *State v. Barber*, 468 A.2d 277, 278 (R.I.1983); *State v. Burgess*, 465 A.2d 204, 206–07 (R.I.1983).

**15.** Rule 803(4) of the Rhode Island Rules of Evidence excludes from the hearsay rule: `

"Statements made for the purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause of exter-

nal source thereof insofar as reasonably pertinent to diagnosis or treatment, but not including statements made to a physician consulted solely for the purposes of preparing for litigation or obtaining testimony for trial."

In *Pina,* in which the only issue at trial was whether the intercourse was consensual, this Court held that a doctor's statements about defendant's alleged threats merely acted to assign fault by clarifying the issue of consent; therefore, the statements were not pertinent to medical diagnosis or treatment and were inadmissible. In the same year that *Pina* was issued, this Court held that a medical history report constituted inadmissible hearsay in two more cases, both of which relied on Pina. *See Barber,* 468 A.2d at 278; *Burgess,* 465 A.2d at 206–07. Similarly, in *In re Andrey G.,* 796 A.2d at 456, the Court held inadmissible a child's statements in a medical document that respondent had sexually abused her because it merely assigned fault rather than assisted the doctor in medical diagnosis.

In some cases, this Court has held that medical history reports that contain information about a sexual assault are admissible. In those cases, however, the material issue was not consent, but rather whether a sexual assault actually had occurred. *See State v. Pierce,* 689 A.2d 1030, 1033 (R.I.1997) (holding that purpose of hospital visit was to determine whether sexual assault had occurred); *In re Jean Marie W.,* 559 A.2d 625, 630 (R.I.1989) (holding that child's statements were used to establish that sexual abuse had actually occurred, but did not ascribe fault); *State v. Ucero,* 450 A.2d 809, 815 (R.I.1982) (holding that purpose of hospital visit was to determine whether sexual assault had occurred). Here, there is no question that Ms. Smith and defendant had a sexual encounter on the night in question, making these cases inapplicable.

### 3. Discussion

■ Applying the rule set forth in *Pina,* we hold that Dr. Swiatkowski's verbatim rendition of the un-redacted medical summary report should have been excluded because it contained information that was not reasonably related to either diagnosis or treatment. Like the question presented in *Pina,* 455 A.2d at 315, "the instant case presents no question as to whether or not sexual intercourse took place. The only issue is whether intercourse was voluntary or involuntary." Doctor Swiatkowski's verbatim recitation of her medical summary report included many narrative details that were unconnected with diagnosis or treatment and that strongly, and graphically, imputed criminal fault to defendant. It contains facts clearly inapposite to medical diagnosis or treatment, such as statements defendant allegedly made to Ms. Smith, and the assertion that "[p]atient originally was consensual, but after approximately three minutes, she told the man, 'No.' He became abusive * * *." The doctor's testimony, a near-perfect repetition of the complaining witness's version of events, is replete with assignments of fault, asserting in conclusive terms that "he then raped her both vaginally and anally several times" and "forced fellatio on her."

We are hard pressed to discern how some of the statements related in the narrative would assist in the diagnosis or treatment of the complaining witness. The doctor did not provide any medical reason as to why she obtained this narrative. Although Dr. Swiatkowski answered "yes" when the state pointedly asked her if she gathered information about the sexual assault for purposes of medical diagnosis and treatment, when the doctor was invited to elaborate, she stated, "[f]rom a medical perspective, the document is from the rape kit, it's just to gather information about the assault." This suggests forensics, not medicine.

We further conclude that allowing Dr. Swiatkowski to read the entire "medical summary of alleged assault" was highly prejudicial to the defendant. "We have

often recognized that a physician's testimony can carry with it an impression of great credibility." *Veluzat*, 578 A.2d at 96; *see Pina*, 455 A.2d at 315 ("A doctor clothed in the garb of a medical expert possesses substantial stature in the eyes of a jury."). We have further recognized that, where the only witness to the alleged sexual assault is the complainant, "[t]he doctor's repetition of the victim's version of events [is] sure to lend it credibility. A medical expert cannot serve the function of a thirteenth juror by evaluating the credibility of witnesses." *Veluzat*, 578 A.2d at 96–97 (quoting *Pina*, 455 A.2d at 315). The introduction of this medical history narrative is especially prejudicial in that it corroborated the details set forth in the testimony of the complainant concerning the alleged sexual assault, surely lending to its credibility. *See Barber*, 468 A.2d at 278; *Burgess*, 465 A.2d at 206–07; *Pina*, 455 A.2d at 315.

We recognize that in the likely event that the state seeks to introduce the narrative portion of the medical records at defendant's retrial, it will do so upon a new record and under differing circumstances. Its admissibility undoubtedly will depend in large measure on the foundational testimony of the doctor. With respect to the case on appeal, however, we are satisfied that the admission of the entire unexpurgated medical report narrative, both as a document and then as read to the jury, was in error. Because we are vacating the judgment on other grounds, we need not consider whether such error was harmless.

## C

### Expert Opinion Concerning Age of Bruises

One of the key issues at trial was whether the complaining witness's multiple bruises and bite markings were inflicted by defendant or whether—as defendant insinuated—she already had suffered injuries from some previous sexual encounter before she met with defendant on November 8, 2003. The state asked Dr. Swiatkowski to give an expert opinion on the age of the bruises that she observed on the complaining witness's body. She opined, to a reasonable degree of medical certainty, that the bruising occurred within twenty-four hours of her examination. Doctor Swiatkowski explained that as a bruise ages, it goes through different color phases, although she acknowledged that the coloration and healing process is different on every patient can be affected by various factors, such as medication. She said that she based her judgment on coloration, as well as on redness, bite marks, and raised parts of the skin.

The defendant argues that the trial justice committed reversible error when she permitted the state's doctor to offer an opinion concerning when the complaining witness suffered bruising. The defendant's position is that the state did not lay a medical or forensic foundation for this expert testimony. He asserts that the question of the aging of bruises is more a forensic than a medical issue, and is not within the ordinary and usual expertise of a medical practitioner. The state counters that the trial justice did not err in permitting Dr. Swiatkowski to testify about the approximate age of the complaining witness's bruises. The state argues that a foundation does "not have to be elaborately presented before the expert testifies to her conclusion if the information is common and well understood." [16]

### 1. Standard of Review

In reviewing a trial justice's ruling on the admissibility of an expert wit-

---

16. The state argues, alternatively, that defendant did not preserve his foundational argument because it was not "specifically focused enough." When the trial justice asked de-

ness's proffered testimony, "this Court will not reverse the decision unless the trial justice abused his or her discretion." *State v. Rieger,* 763 A.2d 997, 1004 (R.I. 2001) (citing *State v. Morales,* 621 A.2d 1247, 1249 (R.I.1993)). We will sustain the ruling below provided that the trial justice's discretion "has been soundly and judicially exercised, that is, if it has been exercised in the light of reason applied to all the facts and with a view to the rights of all the parties to the action * * *." *In re Mackenzie C.,* 877 A.2d 674, 684 (R.I. 2005) (quoting *Owens v. Silvia,* 838 A.2d 881, 890 (R.I.2003)).

## 2. Discussion

■ Under Rule 705 of the Rhode Island Rules of Evidence, "an expert's opinion must be predicated upon facts legally sufficient to form a basis for his [or her] conclusion." *Gallucci v. Humbyrd,* 709 A.2d 1059, 1063 (R.I.1998) (quoting *Alterio v. Biltmore Construction Corp.,* 119 R.I. 307, 312, 377 A.2d 237, 240 (1977)).[17] Such facts must be disclosed so that it is possible "to assess whether the conclusions drawn from the facts possess sufficient probative force or, rather, are grounded in mere speculation or conjecture." *State v. Hanes,* 783 A.2d 920, 927 (R.I.2001) (quoting *DeChristofaro v. Machala,* 685 A.2d 258, 267 (R.I.1996)). Another major purpose of this requirement is to facilitate intelligent cross-examination. *Gorham v. Public Building Authority of Providence,* 612 A.2d 708, 717 (R.I.1992).

At times, the scientific foundation for a particular expert opinion is so common and well understood that the expert's qualifications are sufficient to assure that the opinion has an adequate foundation. *See, e.g., Gallucci,* 709 A.2d at 1063–66 (holding expert's qualifications as a board-certified orthopedic surgeon, the substantial nature of his examination, and his review of patient records to be a sufficient foundation for him to proffer opinion as to causation); *cf. Owens,* 838 A.2d at 892 (noting that under Rule 702 of the Rhode Island Rules of Evidence, the scientific foundation for an expert's theory may be so common and well understood that the proponent of the testimony can lay the foundation while qualifying the witness). We caution, however, that this narrow situation is not intended to subsume the rule.

It is our opinion that the trial justice did not abuse her discretion in permitting Dr. Swiatkowski to testify about the aging of the complaining witness's bruising. The doctor's opinion was not without a medical foundation; she explained that as a bruise ages progresses, it changes in coloration and that the coloration process helps determine when the injuries were sustained. She explained that older bruises present themselves in shades of green and yellow, whereas newer bruises are more red and purple. She stated that she based her judgment on other, additional facts—such as the redness of the skin around the bruises, indentations in the skin that appeared to be bite marks, and raised or swollen skin. She also explained that all the bruises were similar in appearance. Because Dr. Swiatkowski is an emergency room physician with experience and train-

---

fense to articulate his grounds for objection, he stated, "I don't think there was a satisfactory basis for that opinion." We are satisfied, however, that the foundational grounds for the defense's objection were entirely clear.

**17.** Rule 705 of the Rhode Island Rules of Evidence provides:

"Unless the court directs otherwise, before testifying in terms of opinion, an expert witness shall be first examined concerning the facts or data upon which the opinion is based."

ing at Women & Infants Hospital and Detroit Receiving Hospital, we believe that her qualifications, coupled with the factual basis for her opinion, are sufficient to assure this Court that the trial justice based her ruling on more than "mere speculation or conjecture." *Hanes,* 783 A.2d at 927 (quoting *DeChristofaro,* 685 A.2d at 267). Furthermore, the doctor's testimony was buttressed by photographs of Ms. Smith's injuries, which showed her bruises changing color over time.

The doctor's testimony also provided the information necessary for intelligent cross-examination. The defendant was able to extract from Dr. Swiatkowski the acknowledgement that the bruises on every patient age and heal differently and that bruising can be affected by medication, among other factors. The defendant also asked her whether the bruising could have occurred more than twenty-four hours before the patient was examined, to which the doctor replied in the negative. The defendant chose not to follow this line of questioning any further.

With these considerations in mind, we cannot say that the trial justice abused her discretion by allowing Dr. Swiatkowski's to opine on the age of the complainant's bruises.

## III

### Conclusion

For the reasons stated in this opinion, we vacate the judgment of conviction entered in the Superior Court. The case shall be remanded to the Superior Court for a new trial consistent with this opinion.