**Supreme Court**

No. 2014-334-Appeal.
No. 2014-335-Appeal.
(PC 06-5973)

Louis Paolino et al.                    :

v.                            :

Joseph Ferreira et al.                  :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2014-334-Appeal.
No. 2014-335-Appeal.
(PC 06-5973)

Louis Paolino et al.         :

v.         :

Joseph Ferreira et al.         :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.**  This dispute has generated two separate appeals.  The first is the appeal of the prevailing plaintiffs, Louis Paolino and Marie Issa (collectively plaintiffs), from adverse rulings made by the trial justice in favor of the defendants, Joseph I. Ferreira, LKQ Corporation, the Joseph I. Ferreira Trust, and J.F. Realty, LLC (collectively defendants).  The second is the appeal of Attorney Brian Wagner, who appeals sanctions that were imposed against him by the trial justice.

In the first appeal, plaintiffs contend that the trial justice erred when she (1) failed to order injunctive relief sought by plaintiffs; (2) refused to allow plaintiffs to amend their pleadings to conform to the trial evidence regarding a punitive damages claim against defendant, J.F. Realty, LLC; (3) did not permit plaintiffs' expert to testify that storm water runoff from defendants' property caused the seepage of oil along a man-made ditch located on plaintiffs' property; and (4) failed to grant a new trial based upon plaintiffs' newly discovered evidence. After careful consideration of the record, and for the reasons set forth in this opinion, we

- 1 -

conclude that the trial justice impermissibly limited the testimony of plaintiffs' expert. Consequently, we affirm in part, and vacate in part, the judgment of the Superior Court and remand for a new trial on all issues with the exception of the prayer for injunctive relief.

# I

## Background

This dispute arises from the use of a thirty-five acre parcel of land in Cumberland. Since the 1940s, the property has hosted, from time to time, a pig farm, a gravel pit, a dump, and a salvage yard for motor vehicles.

In October 1983, Joseph Ferreira purchased approximately thirty acres of the property for use as an auto salvage yard.[1]  Advanced Auto Recycling (AAR), which was an auto salvage company that Ferreira owned, began to operate on the property about five to six months after Ferreira purchased it. The Ferreira property included a stream and two large ponds, one of them man-made, that bordered the land that Paolino would later purchase.

When Ferreira purchased the property, it was vacant with the exception of a small trailer, and the property was littered with considerable debris, tires, and scrap metal. Despite the condition of the land, Ferreira did not have any environmental firms inspect the property before he purchased it. He did, however, clean it up right after acquiring it by removing the metal and tires from the property; indeed, he claimed that he removed thousands of tires. Ferreira testified that it took him three to five years to finally get the property to look clean.

Soon after Ferreira took ownership, he began to fill in wetlands. He said that, as a result of those alterations, the larger pond was filling with water at a rapid rate; therefore, he needed to enlarge the stream.

---

[1] Throughout this opinion, this property will be referred to as the Ferreira property.

Those alterations did not escape notice. In November 1983, the Rhode Island Department of Environmental Management (DEM) inspected Ferreira's property in response to a complaint that he was filling a pond. DEM sent Ferreira a notice of violation, ordering him to stop filling in the pond. He did, however, continue to enlarge the stream. At a later date, a DEM employee spoke to Ferreira about alternative ways to alleviate the problems that he had observed on the property. Eventually, Ferreira entered into a consent agreement with DEM that required him to employ erosion controls and to address the ongoing environmental violations.

Soon after he purchased the property, Ferreira constructed a building that was used for dismantling cars and as an office. The building was approximately two hundred feet away from the stream. When construction of the building was complete, he began to bring vehicles onto the property. In 1991 he constructed a second building along the border of Paolino's property. At trial, Ferreira testified that he did not conduct a survey before he built that structure, but that he was told it would be seven to ten feet away from the property line. An addition to the building was completed in 2001; again, no survey was performed.[2] By 2001, the Joseph I. Ferreira Trust (the trust) owned the property. Ferreira was the sole trustee of the trust.

By October 2005, Ferreira, as trustee of the trust, had sold his business to LKQ Corporation (LKQ), a national auto-recycling company. The trust then conveyed the land to J.F. Realty, LLC (J.F. Realty), of which Ferreira was the sole member. That entity then leased the property to LKQ. In response to another DEM inspection in 2005, requiring AAR to install temporary drainage controls, a plan was submitted and approved. Pursuant to that plan, Ferreira

---

[2] Robert Yabroudy, Ferreira's controller, later testified that a survey had been conducted in 2003 by Cournoyer Enterprises (the 2003 Cournoyer survey) but that the survey was not used in conjunction with the construction of the storm water pollution prevention system.

- 3 -

hired Commonwealth Engineers to design and install a storm water pollution prevention plan on his property, which was completed by 2008.

## AAR Operations

During his testimony at trial, Ferreira described the activities conducted on the AAR site, testifying that automotive fluids would be drained and captured inside the building before a car was placed in the yard. The fluids would be deposited into barrels and recycled. Ferreira testified that oil was stored outside next to the addition to the first building, which was about 100 to 150 feet away from Paolino's property. During his testimony, Ferreira further acknowledged that he had noticed turbid water running off the site even after the installation of the storm water pollution prevention plan, and that he had occasionally seen oil drip from engines on his property. He also testified that he never deposited any scraps of metal, auto parts, tires, or fluids onto Paolino's property or in any of the ponds.

## Paolino Purchases

In December 1985 LM Nursing Services Inc. (LM Nursing), Paolino's company, purchased six acres on Curran Road that abutted Ferreira's property. In 1987 Paolino received a letter from DEM about the potential release of contaminants in the area, notifying him that his land was on the CERCLIS[3] list. Paolino promptly hired Environmental Resource Associates, Inc. (ERA), a company specializing in investigations of environmental contamination, to conduct tests on his land. After ERA's site assessment was complete, LM Nursing conveyed the property to Paolino and his wife, Marie Issa. Additionally, after all the testing was completed, Paolino's attorney wrote to the EPA requesting that his property be removed from the CERCLIS list

---

[3] CERCLIS (Comprehensive Environmental Response, Compensation and Liability Information System) is a database maintained by the EPA as part of the Superfund program. See U.S. Dep't Health & Human Servs., What is "CERCLIS"?, TOXMAP FAQ, https://toxmap.nlm.nih.gov/tox map/faq/2009/08/what-is-cerclis.html (updated Nov. 2016).

because no contamination had been revealed by ERA's testing. As a result, the Paolino property was removed from the CERCLIS list. Paolino claimed that he did not have any further problems with contamination on his property throughout the 1990s. Indeed, he said that the Division of Air and Hazardous Materials of DEM sent a letter indicating that the stream was sampled two times, once in 1987 and once in 1990, and that neither sample found contamination.

Despite Paolino's claims and the DEM letter, contaminants were found in the soil after a potential buyer retained a company called GZA GeoEnvironmental, Inc. (GZA) to evaluate the land. Paolino received a letter of responsibility from DEM asking him to submit a site investigation report as well as naming him as the person "responsible for properly investigating and, if necessary, remediating hazardous materials at the site." GZA did some remediation, but that process was never completed. In December 2004 DEM sent Paolino a letter of noncompliance representing that he, as the owner of the property, was responsible for the investigation and remediation of hazardous material at the site.

On November 16, 2006, plaintiffs filed an action in the Superior Court, asserting that defendants had caused contaminants to flow onto their property.[4] Thereafter, plaintiffs filed a first amended complaint to add a claim for continuing trespass. Subsequently, plaintiffs filed a second amended complaint that contained thirty-five counts, including the addition of claims for public and private nuisance and federal and state environmental violations. The second amended complaint added two new defendants: Joseph I. Ferreira Trust and J.F. Realty, LLC. Eventually,

---

[4] The plaintiffs' original complaint contained five counts brought against Mobil Oil Corporation, Mark Diamond, Philip Diamond, Joseph Ferreira d/b/a Advanced Auto Recycling Inc., and LKQ Corporation. The claims against all but four of the various defendants were dismissed prior to trial, leaving only the named defendants. The plaintiffs subsequently filed a separate federal action that was unsuccessful and is currently on appeal before the First Circuit Court of Appeals.

an eleven day trial was held before a jury.[5]   After judgment entered on behalf of plaintiffs, plaintiffs, nonetheless, timely appealed.

## II

### Issues on Appeal

Before this Court, Paolino and Issa argue that the trial justice erred by failing to order injunctive relief against defendants because of a continuing trespass.  The plaintiffs further argue that the trial justice erred when she precluded plaintiffs' expert from offering his opinion that storm water runoff from defendants' property was the source of the oil located along the man-made ditch on plaintiffs' property.  The plaintiffs also maintain that the trial justice erred when she denied their motion to amend their complaint to conform to the evidence and when she denied their motion for a new trial based on the discovery of new evidence.

Because we are of the opinion that the trial justice erred when she restricted the expert's trial testimony, and because that is dispositive of this appeal, we need not address the other issues raised in the appeal, with the exception of the denial of injunctive relief.

## III

### Failure to Order Injunctive Relief

### A

### Facts and Travel

At the conclusion of trial testimony, a jury verdict summary sheet was submitted to the jury.  The jury found that there had been a continuing trespass on Paolino's property and it awarded plaintiffs nominal damages of $1,400.  The continuing trespasses identified were: a corner of defendants' metal building, the headwall and riprap for defendants' storm water

---

[5] It does not escape our notice that the complaint in this case was filed in November, 2006, but that the matter was not reached for trial until June, 2012.

remediation system, and the discharge flowing from defendants' property onto plaintiffs' property. Nearly two years after the jury returned a verdict, plaintiffs filed a motion for entry of final judgment. During the hearing on their motion, plaintiffs claimed they were entitled to injunctive relief to remove the continuing trespasses, the traditional remedy in such cases. Subsequently, an evidentiary hearing was held before the trial justice on plaintiffs' request for injunctive relief.

During the hearing, Paolino identified three photographs depicting the pre-existing condition of the location where the storm water pollution prevention plan was later installed. The pictures did not include the storm water pollution prevention plan discharge pipes.

The defendants' counsel then called Eugene Jeffers, the director of public works for the Town of Cumberland, as a witness. He testified that, since the installation of the storm water treatment system at Curran Road, the town had not experienced any problems with flooding of the road in that area. He also testified that, if the system were to be eliminated or changed, the town would want to review what was going to be done. Eric Beck, a supervisor for the Rhode Island Pollutant Discharge Elimination System (RIPDES) program in the office of water resources at DEM, testified that maintaining the riprap would not require a permit from DEM, but that any other activities that would have the potential to either alter the stream, or any construction, would require a permit from DEM. When asked about removing the riprap, he deferred to DEM about whether a permit was required or not. When asked whether there had been any flooding problems in the area as the system was currently constructed, he answered in the negative. Richard Bessette, a general contractor, testified that the estimated price of removing the building encroachment on Paolino's property was $38,204.50. He also testified that the estimated cost of removing the portion of the headwall encroaching on Paolino's

property was $18,000. Bessette further testified that removing portions of the storm water remediation system away from Paolino's property would cost either $52,468 or $65,795, based on estimates obtained from two separate companies.

Later that afternoon, the trial justice issued a bench decision, granting plaintiffs' request for injunctive relief in part and denying it in part. She ordered only that the encroachment of defendants' metal building be removed. With respect to the encroachments of the headwall, riprap, and discharge of the storm water, the trial justice found that there was no bad faith on the part of defendants. After balancing the equities, she concluded that the remaining encroachments were de minimis and that their removal would not benefit plaintiffs, but rather would disproportionately harm defendants.

The trial justice stated that the general rule for a continuing trespass is injunctive relief, citing Santilli v. Morelli, 102 R.I. 333, 230 A.2d 860 (1967). She noted, however, that there are exceptions to mandatory injunctive relief, such as when the impact to a defendant is disproportionate to the benefit to the plaintiff, that allow for a balancing of the equities. She also observed that where an encroachment is intentional, the court may refuse to balance the equities, citing Renaissance Development Corp. v. Universal Properties Group, Inc., 821 A.2d 233 (R.I. 2003) (Renaissance).

The trial justice found that defendants did not act in bad faith or recklessly. She credited Ferreira's testimony that he had believed the streambed to be on his property. Furthermore, she noted that Ferreira obtained a building permit to construct a metal storage building close to the stream, evidencing that his understanding of the property boundary was genuine and that he respected what he genuinely believed the boundary to be. She also noted that the survey conducted in 2003 by Cournoyer Enterprises (the 2003 Cournoyer survey) depicted the building

as butting right up to the property line; it did not depict any encroachments. The trial justice found Robert Yabroudy, Ferreira's controller, who testified that he thought the building was right on the property line, to be credible. Additionally, the trial justice noted that plaintiffs' 2009 survey, conducted by Robert Perruzzi, failed to pick up any boundary problem other than the building encroachment, which the survey identified as 0.86 feet over the property line. She stated that "[o]bviously, it was easy to make a mistake about the precise location of the property boundary," as even Perruzzi seemed to believe that the headwall and riprap were on defendants' property. Moreover, the trial justice read little into the fact that defendants failed to disclose the 2003 Cournoyer survey to DEM because it was not news to either party that the storm water remediation system lay close to the property boundary. The trial justice concluded that the boundary encroachments were not caused by bad faith or recklessness, and she continued to balance the equities.

With regard to the encroachment of the headwall and riprap, the trial justice described it as de minimis. She indicated that the end of the headwall for the storm water remediation system extended only about twelve inches over the property line. She said it was clear from the evidence that there was some benefit to the structures as a containment system and that removing the headwall and riprap could complicate the situation on Curran Road. Therefore, she understood the reluctance of the town to allow tampering with the existing structures. Furthermore, she reasoned that it would cost $18,000 to remove the riprap and that there would ultimately be no benefit to plaintiffs if the riprap and headwall were removed.

With respect to the discharge from the storm water remediation system, the trial justice said that the evidence was that redesigning the system and rerouting the discharge to bypass plaintiffs' property would not "materially benefit" anyone. She remarked that the discharge from

the storm water remediation system followed the natural drainage pattern and that, given the lay of the land, surface water runoff from defendants' property would gravitate to plaintiffs' property even in the absence of the storm water remediation system. She reasoned that the evidence indicated it would cost up to $60,000 to redirect the discharge and that the cost of redesigning and modifying the storm water remediation system outweighed the value of plaintiffs' property. She concluded that the financial burden to defendants would be "significant and substantial," especially because the tasks and "associated costs of redesigning and rebuilding * * * would be vastly disproportionate to any benefit [to plaintiffs] * * * if the discharge from that system was to be redirected and the encroaching structures removed."

Regarding the metal building, the trial justice granted plaintiffs' request for injunctive relief. She reasoned that such an encroachment invites more human activity onto the area of plaintiffs' property because people would be retrieving automobile parts that were stored in the structure. She ordered that the encroachment of the metal building be removed and the building scaled back.

## B

### Standard of Review

"A judgment in a nonjury case will be reversed on appeal when it can be shown that the trial justice misapplied the law, misconceived or overlooked material evidence[,] or made factual findings that were clearly wrong." Rose Nulman Park Foundation ex rel. Nulman v. Four Twenty Corp., 93 A.3d 25, 28 (R.I. 2014) (Rose Nulman) (quoting Lamarque v. Centreville Savings Bank, 22 A.3d 1136, 1139-40 (R.I. 2011)). Likewise, "a decision to grant or to deny injunctive relief is discretionary in nature, and such a decision will not be disturbed on appeal

absent a showing of abuse of discretion or error of law." Id. (quoting North End Realty, LLC v. Mattos, 25 A.3d 527, 530 (R.I. 2011)).

## C

### Analysis

On appeal, plaintiffs argue that the trial justice erred when she chose to balance the equities in deciding to deny their request for injunctive relief. Rather, plaintiffs assert that the trial justice should have granted that relief because defendants acted in bad faith and/or recklessly in placing the encroachments on plaintiffs' property, and, therefore, it was inappropriate to balance the equities.

When real property is involved, "[i]t is a bedrock principle of our property jurisprudence that land is not fungible; and, accordingly, equitable remedies are normally used when it comes to injuries and intrusions to it." Rose Nulman, 93 A.3d at 29. Furthermore, this Court has "generally held that the appropriate remedy for a continuing trespass is injunctive relief." Id. We have, however, also recognized that "this general rule is not absolute and that, accordingly, in exceptional cases, a court may, in its discretion, decline to follow it where the injunctive relief would operate oppressively and inequitably." Id. Examples of "these exceptional circumstances include, but are not limited to, acquiescence, laches, or a de minimis trespass." Id.

In addition, "we have also held that courts may withhold injunctive relief after balancing the equities or, put another way, considering the relative hardships to the parties." Rose Nulman, 93 A.3d at 30. Although a trial justice may balance the equities, he or she "is not required to balance the equities before granting injunctive relief * * * [as] '[t]he doctrine of balancing the equities is applied in cases when the enforcement of a restriction will disproportionately harm the defendant with little benefit to the plaintiff.'" Id. (quoting Cullen v. Tarini, 15 A.3d 968, 982

- 11 -

(R.I. 2011)). Rather, "this Court has emphasized, '[t]he issuance and measure of injunctive relief rest in the sound discretion of the trial justice.'" Id. (quoting Cullen, 15 A.3d at 981).

The plaintiffs cite Renaissance, 821 A.2d at 239, to argue that the trial justice's balancing of the equities was not appropriate here because "the hardship to [the] defendants was self-inflicted." In Renaissance, this Court concluded that a balancing of the equities was not supportable because "defendants knowingly and deliberately encroached on [the plaintiff's] property, and did so even after the encroachment was prohibited by [the plaintiff]." Id. Furthermore, this Court reasoned that, even if the balancing of the equities had been appropriate under the circumstances, the encroachment was more than de minimis. Id. Conversely, the trial justice here found that defendants did not act in bad faith or recklessly. Rather, she credited Ferreira's testimony that he believed that the streambed was on his property. The trial justice also said that the 2003 Cournoyer survey did not reveal any encroachments and the 2009 survey conducted by Paolino noted only the building encroachment. Additionally, the trial justice observed that "[o]bviously, it was easy to make a mistake about the precise location of the property boundary" as Perruzzi himself seemed to believe that the headwall and riprap were on defendants' property. Lastly, the trial justice read little into the fact that defendants failed to disclose the 2003 Cournoyer survey to DEM because it was acknowledged that the storm water remediation system lay close to the property boundary. Because the trial justice found that defendants did not "knowingly and deliberately encroach[]" upon plaintiffs' property, but actually respected what they genuinely believed the property line to be, it is our opinion that the trial justice did not err when she determined that defendants did not act in bad faith or recklessly, and concomitantly she did not err when she balanced the equities to determine whether to grant or deny injunctive relief.

- 12 -

Furthermore, it is our opinion that this case falls within the exceptional circumstances that this Court has said justifies the use of a trial justice's discretion to decline to order mandatory injunctive relief. In Santilli, 102 R.I. at 335, 230 A.2d at 862, the defendants' wall extended eighteen inches into the plaintiffs' property, constituting a continuing trespass. The defendants argued that the encroachment of the wall did not "substantially interfere with [the] plaintiffs' use of their land, that such relief is of no real benefit to [the] plaintiffs, and that it would cause considerable inconvenience and pecuniary obligation to [the] defendants." Id. at 337, 230 A.2d at 863. Although this Court in Santilli declined to apply the exception to the general rule of granting injunctive relief for continuing trespasses, we did, however, acknowledge that "the existence of such circumstances may in exceptional cases move the court to withhold the coercive relief contemplated by the general rule." Id. at 338, 230 A.2d at 863; see also Bentley v. Root, 19 R.I. 205, 208, 32 A. 918, 919 (1895) ("Assuming all the obstruction which the complainant claims, still, as it does not interfere with his use of the way, and relief in equity would be of no real benefit to him, but a cause of great trouble to the respondents, * * * we may properly leave him to his remedy at law."). We are satisfied that this case involves such exceptional circumstances, warranting a balancing of the equities.

It should not be overlooked that the trial justice granted plaintiffs' request for injunctive relief with respect to defendants' metal building, even though the structure encroached onto plaintiffs' property by a mere five inches. She reasoned that such an encroachment invites continuous human activity onto plaintiffs' property because the metal building was used in connection with a business.

In Renaissance, 821 A.2d at 239, this Court concluded that the encroachment was more than de minimis. This Court reasoned that "[the plaintiff's] access to the back portion of its lot

was restricted, the amount of land involved was approximately 250 square feet, and the result of the encroachment was the economic enrichment of [the] defendants at the expense of [the plaintiff]." Id. Similarly, in Rose Nulman, 93 A.3d at 32, this Court stated "that an encroachment of some 13,000 square feet is not a minimal one * * * [and] is not small enough that a balancing of the equities makes the hardship to [the] defendants outweigh the harm to [the] plaintiffs." Here, unlike in Renaissance and Rose Nulman, the trial justice described the twelve-inch encroachment of the headwall and riprap as de minimis, and it is clearly not the same as the 13,000 square feet encroachment in Rose Nulman or the 250 square feet encroachment in Renaissance.

For these reasons, we are of the opinion that the trial justice did not misapply the law, misconceive or overlook material evidence, or make factual findings that were clearly wrong, and, thereby, did not stray beyond the broad discretion she was afforded.

**IV**

**Preclusion of Opinion Testimony of Expert**

**A**

**Facts and Travel**

Alvin Snyder, a consulting environmental and chemical engineer at ERA, was offered as an expert witness by plaintiffs to testify about the contaminants on the properties at issue. Snyder offered that he had a Bachelor of Science degree in chemical engineering from Clarkson College of Technology and that he was registered as a professional engineer in Massachusetts, Rhode Island, Connecticut, and Ohio and as a site professional in Massachusetts. Paolino engaged him to conduct an assessment of his property. In order to prepare for his testimony, Snyder identified and reviewed all the information available to him pertaining to the property;

this included thousands of pages of documents.[6]  Snyder testified that those documents were the types of documents that are customarily and reasonably relied upon by site assessment professionals when performing site assessments.  As permitted under Rule 703 of the Rhode Island Rules of Evidence, Snyder relied upon those documents to formulate his expert opinion.  He also visited the property and analyzed various soil and water samples.

Snyder testified that storm water, following the natural topography of the land, runs from Ferreira's property into the stream on Paolino's property.  He further testified that aerial photographs that had been taken in 1981, 1988, 1996, and 2005 revealed that Ferreira parked a number of vehicles for his auto salvage business on land directly abutting the stream.  He noted that one of the stipulations of special conditions in the wetlands alteration permit that was issued to Ferreira in 1986 was that he maintain a twenty-foot buffer between the stream and any activities.  From his review of the aerial photographs, Snyder was able to determine that Ferreira had not complied with those buffer zone requirements.  Snyder also testified that his review of an EPA-commissioned report dealing with the Ferreira property indicated that there was contamination entering the stream.

---

[6] Those voluminous documents included, among others, reports that had been prepared by various consulting firms and included a site assessment in 1987 by ERA, remediation cost data that is commonly used in the environmental field for determining cost in remediation, a 2004 Weston Solutions report on Ferreira's property that the EPA prepared, a report by Lord Associates provided to DEM in November 2004, and a site investigation report on Paolino's property from 2005 prepared by Pine River Environmental Consulting.  Snyder also reviewed the New England Environmental report on the wetlands permitting and resource areas on Paolino's property in 2007, a letter report on hydrology in 2008 for Paolino's property, and a survey completed by Perruzzi for Paolino's property in 2009.  The witness said he had also examined photographs of the property.  The witness also undertook the effort to correspond with various agencies, including the Pawtucket Water Supply Board (PWSB) that supplied him with field observations and analytical measurements that they had taken of samples of storm water that was being discharged by the neighboring property over time.  He spoke to GZA and obtained certificates of analysis for a remediation that had been done on Paolino's property.  Snyder also conducted a file review at DEM in May 2009 of the site remediation, the hazardous waste, and the water resource files.

Significantly, the witness testified that the tests that had been conducted by ERA in 1987 revealed no contamination on Paolino's property, but that soil borings from Paolino's property in 2007 showed the presence of oil contamination.[7]  Snyder spoke of the analysis done by the Pawtucket Water Supply Board (PWSB) that determined the presence of other components of gasoline in the sample.  He said that a hydrology report from 2008 indicated there was oil sheen at the entry point from the storm water emitting from Ferreira's property into the stream.  Similarly, he said that, during testing done by GZA, oil was found floating on the surface of some of the test pits, along with concentrations of TPH,[8] which he identified as lubrication oil and motor oil.

During his many visits to the site, Snyder observed a significant amount of auto parts along the property line as well as on Paolino's property.  He also determined the presence of turbidity[9] in the stream water.  Snyder testified that he conducted both surface water testing and some soil testing.  He testified that there was oil in the stream, and that, generally, the results of the surface water testing revealed that the composition of the upstream water did not change appreciably during storms but that the composition of the discharge in the headwall changed drastically.[10]  Snyder also testified that, in general, the metal concentrations increased in the

---

[7] The soil borings specifically found solvents, metals, lead, and LNAPL (light non-aqueous phase liquid), which is anything that floats on water, be it oil or gasoline.

[8] TPH is an acronym for total petroleum hydrocarbons; it is a laboratory procedure using a gas chromatograph, Method 8100M, and it determines the amount of petroleum-based organics in a sample.

[9] The American Heritage Dictionary defines "turbid" as "[h]aving sediment or foreign particles stirred up or suspended; muddy[.]"  The American Heritage Dictionary 1304 (2d ed. 1982).

[10] The stream turbidity upstream was 1.3 NTU units in the beginning and rose to 2.8 during the end of the storm.  Suspended solid was not found in the beginning but raised to 2 afterward.  Oil was nondetectable in the beginning but rose to 190 parts per million afterward.  Lead was not detectable at the beginning and not detectable in the end.  The sample in the channel at the beginning of the storm had an old petroleum septic odor to it, but toward the end of the storm it had no odor.  Turbidity was 15 NTUs in the beginning of the storm and jumped to 100 NTUs.

storm water, but "did not increase to any significant degree in the upstream sample." Snyder added that he took care to take samples from only the storm water coming from the property so that it would not include any runoff from Curran Road. He testified that the oil from the storm water was "fingerprinted" and identified as lube oil or compressor oil. With respect to the soil testing, Snyder testified that the soil samples on the north side of the storm water channel revealed 7,000 parts per million of TPH that was identified as lube or compressor oil. He added that when he dug a trowel four inches into the sediment, a bubble of oil came up in the water.

### Snyder's Opinions and the Sustained Objections

Snyder opined that the contamination on Paolino's property "lies in the water"; that "all along the stream," "along the banks of the pond to the north," and "the GZA area," there is contamination. He also testified that there was a considerable amount of automobile parts on Paolino's property and in the ponds. When plaintiffs' counsel asked Snyder if he had an opinion as to what caused the contamination at the site of GZA's testing (the GZA site) on plaintiffs' property, defendants' counsel objected. The trial justice allowed the witness to answer yes or no but stated, "I think we're going to need some more foundation." The plaintiffs' counsel then asked Snyder to describe what the documents regarding the location of the filling indicated to him. After having Snyder recount those documents, plaintiffs' counsel followed up by again asking whether Snyder had an opinion as to the cause of the contamination at the GZA site; defendants' counsel again objected and the trial justice sustained the objection, based on a lack of foundation. At this point, plaintiffs' counsel made an offer of proof at sidebar, but the trial justice continued to sustain the objection. The trial justice said that Snyder's testimony did not seem scientifically based since "[a]ll he's doing is saying Ferreira was working in the area;

Suspended solid, an indication of turbidity, jumped from 12 to 320 parts per million. Oil, TPH, went from 360 parts per billion to 2,200 parts per billion.

Ferreira was putting fill in; and somehow Ferreira must have had obtained contaminated fill and placed it there." As an offer of proof, plaintiffs' counsel noted that Snyder would testify that there was no oil spill in the area because of the absence of evidence of an oil spill downstream.

After the sidebar, plaintiffs' counsel asked whether Snyder had an opinion as to whether a significant oil spill had caused the contamination at the GZA site; defendants' counsel objected, and the trial justice sustained the objection. The plaintiffs' counsel made an offer of proof that Snyder was prepared to testify that the contamination around the stream banks indicated to him that it was caused in a different manner and it was not caused by a significant oil spill.

The plaintiffs' counsel then asked Snyder if he had reviewed any documents that evidenced in any way that there ever had been a significant oil spill downstream from Paolino's property, to which he answered no. Following up, plaintiffs' counsel asked whether there was anything about the pattern of contamination in the GZA site that indicated to Snyder one way or another how that contamination had taken place. In response, Snyder testified that GZA did TPH analyses on the oil in the pond and determined that it was lube oil and motor oil. Snyder further testified that the fact that most of the contaminants were found near the stream indicated to him that that was probably the original location where oil was either spilled or placed and then it spread to other areas of the pond in the soil. His opinion was offered to a reasonable degree of scientific certainty.

The witness further testified that he found oil and lead on both sides of the stream at the water line. Then, plaintiffs' counsel asked whether Snyder reviewed any records indicating that oil or lead was coming from one property or another and going to the stream. The defendants' counsel objected once again and the trial justice again sustained the objection. When plaintiffs'

counsel asked whether the DEM report, dated March 22, 2005, revealed anything about oil entering the stream, defendants' counsel repeated his objection and a sidebar followed. At sidebar, plaintiffs' counsel reassured the trial justice that this question was part of the foundation he was laying. The trial justice said, "there's a difference between reviewing a bunch of documents and identifying the factual basis for the opinion." The trial justice continued,

> "he needs to give us the facts upon which he has concluded something about how this entire length of the streambed became contaminated. He needs to articulate them. That's a little bit more than 'I looked at a bunch of records.' Okay? And there's got to be some science behind it. So however you come at it, fine, but I need the science and I need the facts and data."

The trial justice again sustained the objection.

After the sidebar conference was concluded, plaintiffs' counsel inquired of Snyder how he came to reach his conclusion as to the origin of the contamination along the streambed. Although Snyder was allowed to testify that he found oil and lead to be emanating from the adjoining property, his opinion that storm water flowing into the stream from that property had concentrations higher than had been measured previously was stricken from the record. The plaintiffs' counsel then asked Snyder about GZA's testing along the stream, closer to Ferreira's property, and Snyder testified that GZA found that the soil was contaminated with oil that matched lube oil. The plaintiffs' counsel asked Snyder if his own soil sample testing, including those along the stream, found any evidence of oil. Snyder answered affirmatively. The witness was then asked if, after reviewing documents and his own samples and GZA samples on both sides of the stream, he had an opinion as to the cause of the TPH found in his test results. The defendants' counsel objected and the trial justice sustained the objection.

After dismissing the jury and Snyder for the day, the trial justice went on the record to express her concern that Snyder had not provided any scientific foundation that would

- 19 -

demonstrate that contaminants flowed from Ferreira's salvage yard onto Paolino's property. The defendants' counsel chimed in that, because there was no baseline study done at any point in time, the jury would not be able to make any kind of a proximate cause determination with respect to the individual defendants. Although the trial justice acknowledged that common sense would indicate that an auto salvage yard could pose a real danger of contaminants migrating to adjacent properties, she nonetheless, observed there had never been a thorough assessment of the Ferreira property such that anyone could pinpoint what the nature and extent of the contaminants were along the streambed over time.

The next day, when Snyder resumed the stand, he testified that the GZA test pits did not indicate contamination at the surface, but at about five to six feet in depth, signifying that it was a different mechanism, such as the placement of fill, that caused the contamination in the GZA site versus the contamination that was found in the stream. He also confirmed that he was familiar with the chemical makeup of the materials that would be common to an auto recycling yard, such as oil and lead. He testified that the result of chromatography tests he had run indicated that there was lubricating oil or motor oil in the soil sample. Additionally, Snyder testified that GZA had conducted several analyses on test pits in the area and that several were found to contain motor oil. Snyder further testified that oil will float and travel down a stream until it absorbed into the banks of the stream. He stated that certain types of oil can remain in the ground for decades while others, like gasoline, can biologically degrade over time and dissipate. Motor oil, which he said is slow to degrade, was found in a soil sample taken on plaintiffs' property near the stream.

The plaintiffs' counsel asked Snyder to explain the process by which oil or sediment would get into surface water runoff in an auto salvage operation. The defendants' counsel

- 20 -

objected to this question and the trial justice sustained the objection. Snyder was, however, allowed to testify that he reviewed reports indicating the presence of oil on the ground of the AAR site. The plaintiffs' counsel then inquired if the witness had reviewed any reports that revealed contamination of storm water in the stream. In response, Snyder testified that he reviewed the Rhode Island screening site inspection report from 1989, which indicated that the stream was contaminated by oil and turbidity. The plaintiffs' counsel then asked Snyder:

> "Do you have an opinion based upon the testing that you did, the testing that GZA did, the chromatography testing that was done, the surface water flow on the Advanced Auto Recycling property, the observations of yourself and others which you've testified to, regarding the stormwater discharge from the Advanced Auto Recycling property * * * and your review of the water testing in this case and the aerial photographs and other photographs you reviewed, as to whether or not the Advanced Auto Recycling property is discharging any oil or sediment into the stream on the side of the property?"

Again, defendants' counsel objected and the trial justice sustained the objection. Snyder, however, was permitted to testify that the storm water discharge was emitting turbidity and sediment onto Paolino's property, but he was not allowed to testify that the discharge was emitting oil. The sustained objections to this line of questioning continued for some time until plaintiffs' counsel asked:

> "Based upon the reports you reviewed, your testing, and your personal observations at the site in 2009, did you have an opinion as to whether or not the water that was coming out of the stormwater discharge system at the headwall was causing oil to come onto Mr. Paolino's property?"

To no surprise, defendants' counsel objected. This time, however, the trial justice overruled the objection and Snyder was permitted to opine that the storm water being discharged by the salvage yard from the headwall was polluting Paolino's property with oil. His opinion was to a

reasonable degree of scientific certainty. Nevertheless, Snyder was precluded from opining that the AAR property was discharging oil into the stream on the property.

## B

### Standard of Review

"It is well settled that '[t]he determination of whether to qualify and permit an expert witness to proffer an expert opinion relative to an issue in dispute is left to the discretion of the trial justice and this Court will not disturb that determination absent clear error or an abuse of discretion.'" Foley v. St. Joseph's Health Services of Rhode Island, 899 A.2d 1271, 1280 (R.I. 2006) (quoting Debar v. Women and Infants Hospital, 762 A.2d 1182, 1185 (R.I. 2000)). "When the trial justice has 'soundly and judicially exercised [his or her discretion], in light of the facts and circumstances confronting the court and the parties,' this Court will not reverse the trial justice's decision on appeal." Morabit v. Hoag, 80 A.3d 1, 11 (R.I. 2013) (quoting Dawkins v. Siwicki, 22 A.3d 1142, 1154 (R.I. 2011)).

## C

### Analysis

On appeal, plaintiffs argue that the trial justice erred when she precluded plaintiffs' expert from testifying that the oil located along the man-made ditch located on plaintiffs' property was caused by storm water runoff from defendants' property. The plaintiffs maintain that the expert established a reasonable basis for his opinion.

Before we consider that argument, however, we must address defendants' threshold contention that plaintiffs failed to preserve this issue for appellate review because they failed to make an offer of proof. It is well established that a litigant must make such an offer after a sustained objection to preserve the issue for appeal. Mead v. Papa Razzi, 899 A.2d 437, 445

- 22 -

(R.I. 2006) (citing Manning v. Redevelopment Agency of Newport, 103 R.I. 371, 378, 238 A.2d 378, 382 (1968)).  "It requires an examiner, after objection to a question propounded to a witness has been sustained, to advise the trial court what he expected the witness would have said if allowed to answer."  Manning, 103 R.I. at 378, 238 A.2d at 382.

We are of the opinion that defendants' argument is not well founded because, on more than one occasion, plaintiffs' counsel did make a sufficient offer of proof.  The record reveals the following colloquy:

> "Q Based upon that, do you have an opinion to a reasonable degree of scientific certainty as to the cause of contamination where the GZA remediation took place?
> "[DEFENDANTS' COUNSEL]: Objection.
> "THE COURT: Sustained.
> "[PLAINTIFFS' COUNSEL]: May I make an offer of proof, [Y]our Honor, at sidebar?
> "(The following colloquy took place at the sidebar out of the hearing of the jury)
> "* * *
> "[PLAINTIFFS' COUNSEL]: He said he reviewed the plans that Mr. Ferreira submitted and the plans indicated that fill had occurred in this area.  On the plan submitted by Mr. Ferreira.
> "* * *
> "[PLAINTIFFS' COUNSEL]: I'll have him testify to it. It's a very limited area; okay?  He'll testify that there was—if there was some other—it had to be placed there because of the way the oil, because of the sampled oil on the site.  In other words, there wasn't an oil spill that occurred there because there would be evidence of oil spill downstream.
> "* * *
> "[PLAINTIFFS' COUNSEL]: And just so the record is clear, Judge, because it's going to be an issue obviously, I'll have him testify as to the other factors I just explained about how the area appears; that it wasn't a spill; that he believes it was fill.  But I think a reasonable inference can be made in my argument that Mr. Ferreira—[.]"

The examination of the witness then resumed:

> "Q Was there anything about the area where GZA did partial remediation that gave you an indication one way or other as to how that contamination occurred?
> "A Yes.
>
> > "[DEFENDANTS' COUNSEL]: Objection.
> > "THE COURT: Is this the same opinion we discussed at sidebar?
> > "[PLAINTIFFS' COUNSEL]: I'm just asking whether there's an indication how it occurred scientifically, Judge. Whether there was something there.
> > "THE COURT: Is this the same objection we discussed—same opinion we discussed at sidebar?
> > "[PLAINTIFFS' COUNSEL]: Same area of questions.
> > "THE COURT: Sidebar.
> > "(The following colloquy took place at the sidebar out of the hearing of the jury)
> > "* * *
> > "THE COURT: What is your offer of proof ?
> > "[PLAINTIFFS' COUNSEL]: My offer of proof is that he's going to say the way the contamination was around the banks, that he doesn't believe a significant oil spill caused the contamination; that he believes it was caused in a different manner."

Accordingly, we are of the opinion that in this instance, plaintiffs' counsel has made a sufficient offer of proof and has thus preserved the issue for appellate review.

### The Testimony

Rule 705 of the Rhode Island Rules of Evidence says that "[u]nless the court directs otherwise, before testifying in terms of opinion, an expert witness shall be first examined concerning the facts or data upon which the opinion is based." Under this rule, "an expert's opinion must be predicated upon facts legally sufficient to form a basis for his [or her] conclusion." Gallucci v. Humbyrd, 709 A.2d 1059, 1063 (R.I. 1998) (quoting Alterio v. Biltmore Construction Corp., 119 R.I. 307, 312, 377 A.2d 237, 240 (1977)).

As we have elucidated earlier in this opinion, Snyder's qualification as an expert in his field of chemical engineering was not challenged by the defense. Prior to rendering his opinion, Snyder testified that he reviewed a plethora of documents pertaining to the property, including information that was available through governmental and professional agencies. See note 6, supra. None of the information or documents that he discussed or relied upon was challenged by defendants' counsel. Indeed, it is very clear that these documents were typical of those that are customarily relied upon by site assessment professionals. In addition to reviewing a multitude of documents and reports, Snyder also visited the property and personally analyzed various soil and water samples. He was allowed to testify as to the results of his analyses.

Despite that, the trial justice did not allow Snyder to render an opinion as to whether or not the AAR property was discharging any oil into the stream on the property, even though he was permitted to opine that water coming out of the headwall of the storm water discharge was causing oil to come onto Paolino's property.

This Court has held that we "'will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent[;]' * * * this standard is applicable to a trial justice's determinations with respect to both the relevancy of proffered evidence and the adequacy of the foundation laid for its admission." Bourdon's, Inc. v. Ecin Industries, Inc., 704 A.2d 747, 758 (R.I. 1997) (quoting Soares v. Nationwide Mutual Fire Insurance Co., 692 A.2d 701, 701-02 (R.I. 1997) (mem.) (citing Montecalvo v. Mandarelli, 682 A.2d 918, 927 (R.I. 1996); Puccio v. Diamond Hill Ski Area, Inc., 120 R.I. 28, 38, 385 A.2d 650, 656 (1978))). Before she admits an expert's opinion testimony, "the trial justice must evaluate whether the testimony that a party seeks to present to the jury is 'relevant, within the witness's expertise, and based on an adequate factual foundation.'" Kurczy v. St. Joseph Veterans Association, Inc., 820 A.2d 929, 940 (R.I.

2003) (quoting Rodriquez v. Kennedy, 706 A.2d 922, 924 (R.I. 1998)); see also Franco v. Latina, 916 A.2d 1251, 1258 (R.I. 2007) ("An expert may not give an opinion without describing the foundation on which the opinion rests.") (quoting Gorham v. Public Building Authority of Providence, 612 A.2d 708, 717 (R.I. 1992)).

However, we have also been clear that "absolute scientific certainty is not the standard for the admissibility of expert testimony." State v. Abdullah, 967 A.2d 469, 478 (R.I. 2009) (quoting State v. Morales, 621 A.2d 1247, 1250 (R.I. 1993)). Rather, "[t]he proponent of the evidence need only show that the expert arrived at his or her conclusion in what appears to be a scientifically sound and methodologically reliable manner." Owens v. Silvia, 838 A.2d 881, 892 (R.I. 2003) (citing DiPetrillo v. Dow Chemical Co., 729 A.2d 677, 690 (R.I. 1999)). "If the expert has testified with 'some degree of positiveness,' his or her testimony is admissible and issues relative to the weight of the evidence are left to the fact-finder." Morra v. Harrop, 791 A.2d 472, 477 (R.I. 2002) (quoting Sweet v. Hemingway Transport, Inc., 114 R.I. 348, 355, 333 A.2d 411, 415 (1975)). Moreover, "courts should not exclude highly technical or novel scientific expert testimony simply because they disagree with the conclusions of the expert." Owens, 838 A.2d at 892 (citing DiPetrillo, 729 A.2d at 690). "[A] trial justice should assess whether the reasoning used in forming an expert conclusion was sound, not whether the conclusions drawn from that reasoning were proper." Id. at 896 (citing DiPetrillo, 729 A.2d at 689-90).

Throughout plaintiffs' counsel's direct examination of Snyder, defendants' counsel lodged numerous objections, which, time and again, were sustained by the trial justice based on a lack of foundation. However, it is our opinion that plaintiffs' counsel laid an adequate foundation by having Snyder summarize the conclusions that were made in each of the reports he reviewed. After painstakingly going through each of the documents and aerial photographs,

plaintiffs' counsel concluded by asking Snyder whether his opinion was to a reasonable degree of scientific certainty. Unlike the expert in Skene v. Beland, 824 A.2d 489, 491 (R.I. 2003), who responded to such a question with "I don't know. * * * All I know is [that] it had to happen[,]" Snyder answered affirmatively each time. In Skene, this Court affirmed the trial justice's exclusion of the expert testimony because its lack of specificity created confusion. Id. In that case, the trial justice precluded the expert's testimony because it was laced with uncertainty, lacked supporting evidence, and "was too speculative to logically advance [the] plaintiffs' theory." Id. at 492. Here, however, Snyder consistently affirmed that his opinion was to a reasonable degree of scientific certainty. As we have held previously, absolute scientific certainty is not required for admissibility of an expert's testimony; rather what must be shown is that the expert arrived at his or her opinion "in what appears to be a scientifically sound and methodologically reliable manner." Owens, 838 A.2d at 892 (citing DiPetrillo, 729 A.2d at 690). We are of the opinion that Snyder did, in fact, reach his conclusions in a scientific manner by relying upon the documents that experts in the field commonly rely upon when rendering an opinion and by his own examination of the land in question. The plaintiffs' counsel meticulously went through each report, each photo, and Snyder's own observations to lay the foundation that the trial justice continued to require. This is the type of supporting evidence that was lacking in Skene. And nothing about it was "too speculative to logically advance plaintiffs' theory," because a jury could very well have found causation based on the evidence that Snyder provided.

In Gallucci, 709 A.2d at 1063, this Court held that the expert's testimony established a foundation that complied with Rule 705 and was sufficient to warrant the admission of his opinion in full at trial. Therefore, the trial justice in Gallucci abused her discretion and committed reversible error when she limited the expert's testimony. Id. This Court was satisfied

with the expert's examination and review of the patient and the records from the hospital and other surgeons. Id. We said that any problems with the expert's opinion went to the weight of his testimony rather than its admissibility. Id. at 1064. This Court further noted that, "[a]lthough the trial justice technically permitted [the expert] to testify * * *, she effectively disqualified him by applying an overly rigid standard for the admissibility of individual components of his opinion." Id.; see also Ribeiro v. Rhode Island Eye Institute, 138 A.3d 761, 764 (R.I. 2016) (holding "that the trial justice impermissibly limited the testimony of [the plaintiff's] causation expert"); Morabit, 80 A.3d at 13 ("We have previously found an abuse of discretion on the part of a trial justice when his or her overly stringent application of the test for admissibility of expert testimony 'impermissibly conflate[s] [his or] her own functions with those of the jury.'") (quoting Gallucci, 709 A.2d at 1064).

In this case, Snyder reviewed a substantial amount of documentation related to the property, none of which was contested, and he conducted his own testing of the water and soil on the property. The trial justice remarked on several occasions that Snyder's expert opinion could not be rendered based on the reports of others, observing, "there's a difference between reviewing a bunch of documents and identifying the factual basis for the opinion." However, Snyder did as the expert in Gallucci did; he reviewed the reports of others, and also conducted his own analyses in order to render his expert opinion. This is perfectly appropriate for an expert to do. See Rule 703. As was the case in Gallucci, deficiencies that might exist in the expert's opinion, if any, would affect the weight of his testimony and not its admissibility. This was within the purview of the finder of fact.

Given the facts already discussed, we conclude that there was more than adequate foundation for Snyder's opinion to be considered by the jury. By subjecting plaintiffs to a

requirement that "[Snyder] needs to give us the facts upon which he has concluded something about how this entire length of the streambed became contaminated[,]" the trial justice, in our opinion, "effectively disqualified him by applying an overly rigid standard for the admissibility of individual components of his opinion." Gallucci, 709 A.2d at 1064.

We have said on many occasions that "[t]his Court consistently has held that a jury is free to accept or to reject expert testimony in whole or in part or to accord it what probative value the jury deems appropriate." Morra, 791 A.2d at 477. The customary and suitable means of attacking shaky but admissible evidence is through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof * * *." Owens, 838 A.2d at 892 (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 596 (1993)). As soon as the expert testimony "is determined to possess apparent reliability, the trial justice should submit the expert's testimony to the trier of fact to determine how much weight to accord such evidence." Id. (citing DiPetrillo, 729 A.2d at 690). When "deciding whether to admit proffered expert testimony, the trial justice must take care not to interfere with the jury's role as the trier of fact." Id. at 899 (citing DiPetrillo, 729 A.2d at 687).

Furthermore, it is patently obvious that the reason that the question of remediation of cleanup costs for the entire streambed did not go to the jury was that some of Snyder's expert testimony, particularly with respect to causation, was precluded. In Morabit, 80 A.3d at 14, this Court determined that, because the trial justice's decision was predicated upon the plaintiff's failure to offer proof of damages, the trial justice's exclusion of the expert's "testimony was so prejudicial as to constitute reversible error and require a new trial on that count." We again embrace that rationale and, for these reasons, are of the opinion that the trial justice's exclusion

of Snyder's testimony was an unsustainable exercise of her discretion and that plaintiffs are entitled to a new trial on all issues, excluding the issue of injunctive relief.

## V

## Additional Issues on Appeal

Because we have sustained plaintiffs' appeal and have held that they are entitled to a new trial on all issues, excluding the issue of injunctive relief, we need not, and shall not, rule on plaintiffs' remaining two contentions of error: the trial justice's denial of plaintiffs' motion to amend their pleadings to conform to the trial evidence regarding the punitive damages claim against defendant, J.F. Realty, and her denial of the motion for a new trial based upon plaintiffs' newly discovered evidence.[11]

## VI

## The Sanctions

## A

## Facts and Travel

Paolino engaged Attorney Brian Wagner in December 2012, five months after the jury verdict in this case was returned. After reviewing the case, Attorney Wagner concluded that DEM had not been enforcing a host of regulatory and permit requirements on the Ferreira property. As a result, in May 2013 Attorney Wagner filed a complaint seeking a writ of mandamus to compel DEM to prosecute the regulatory violations (hereinafter mandamus complaint).

When he drafted the mandamus complaint, Attorney Wagner had at his disposal the jury verdict summary sheet that had been submitted to the jury after the trial in this case. Attorney

---

[11] Our review of the record yields no reason why plaintiffs should be precluded from amending their complaint to include the punitive damage count on remand.

Wagner said that he understood "the jury's affirmative responses to mean that the jury had found that Ferreira[] had trespassed on Paolino's property by discharging contaminated water across the boundary between the two properties." Proceeding on that understanding, Attorney Wagner included an allegation in the mandamus complaint that the jury had found that Ferreira had trespassed onto Paolino's property by "[f]ailing to remediate contamination deposited on the Paolino property by pond, surface and storm waters diverted from the AAR Property and onto the Paolino Property." Significantly, to support this allegation, he attached a copy of the jury verdict summary sheet to the mandamus complaint.

By March 2014, Attorney Wagner had entered his appearance in this case as well and, as counsel to Paolino, he filed a motion for entry of final judgment. The motion proposed that the final judgment include injunctive relief based on the jury's findings of trespass. Notably, the motion included the following statement:

> "The jury concluded that the [d]efendants were liable for several trespasses on [p]laintiffs' property involving the construction of physical structures on and across the boundary line, the discharge of pond or storm water across the boundary line and the deposition of pollutants on [p]laintiffs' property by [d]efendants' water discharges."

Again, Attorney Wagner said that he based this statement on his reading of the jury's affirmative responses in the jury verdict summary sheet. In response, Ferreira's counsel submitted an objection to the proposed final judgment and sought sanctions under Rule 11 of the Superior Court Rules of Civil Procedure on the grounds that the motion papers misrepresented the jury's verdict.

Attorney Wagner's motion for entry of final judgment was heard in April 2014. At that time, the court found that Attorney Wagner's statement interpreting the jury's findings was interposed for "improper purposes." The trial justice further indicated that Attorney Wagner's

statement was a "mischaracterization" of the jury's responses to the interrogatories. She went on to say:

> "The jury interrogatories in this case were carefully crafted to respond to the trial evidence. For example, Question Number 1 asks 'Have [p]laintiffs proved by a fair preponderance of the evidence that in 1983 or 1984, Joseph Ferreira both (a) deposited contaminated fill on Lot 362 <u>and</u> (b) committed trespass when he thereafter failed to remove that fill?' The word 'and' was underscored. Question Number 4, on the other hand, asks 'Have plaintiffs proved by a fair preponderance of the evidence that, during the period 1988 through 1997, Joseph Ferreira trespassed upon their property by (a) diverting surface and pond water from his property into the stream bed or channel located on Lot 362, <u>or</u> (b) failing to remove from their property contaminants deposited by that water.' I very deliberately used the word 'or' and not the word 'and.' The word 'or' was underscored. Question[s] 6 and 11 were identical with respect to the Joseph Ferreira Trust for the period 1997 to 2005 and for the J.F. Realty LLC for the period 2005 to 2008. Question 13 was substantially the same question but with respect to the stormwater remediation system and the discharge of contaminants from it."

The trial justice added that the jury "may have found as plaintiffs represent but not necessarily so[,]" and that "[a]ccordingly, [j]ury [i]nterrogatories 6, 11 and 13 permitted the jury to find trespass on an 'either' or 'both' basis."

The court denied the motion for entry of final judgment and directed Attorney Wagner to show cause why Rule 11 sanctions should not be imposed. The trial justice also directed Ferreira's counsel to file an affidavit of fees. At the subsequent show cause hearing, Attorney Wagner claimed that he "believe[d] that the plaintiffs' interpretation of [the jury] responses [was] a good faith reading based objectively on the four corners of the [j]ury [v]erdict [s]ummary [s]heet." He added "that when * * * talking about an interpretation of an answer to a compound question, there is more than sufficient room for multiple opinions as to meaning to avoid taking that long and drastic step to Rule 11 sanctions." Furthermore, it was "difficult [for him] to see

how Rule 11 sanctions would lie in this case for allegations made in a complaint in another case[,]" i.e., the mandamus complaint. Attorney Wagner argued that "[i]f those allegations in that case are sanction worthy, then defendants should make a motion at the proper time and in the proper place for sanctions in the other case." At the conclusion of the show cause proceedings, the trial justice remarked, "[w]ell, I think we agree we will never know whether the jury thought that it was trespass just by water or whether it was trespass by water and depositing contaminants."

Nonetheless, after the show cause hearing was concluded, the court issued a decision imposing sanctions in the sum of $6,647 on Attorney Wagner. The trial justice found that Attorney "Wagner attempted to achieve [p]laintiffs' ultimate goals by improperly editing the jury interrogatory questions, spinning the jury's answers into something materially different than they were and representing them as fact." She further indicated that Attorney "Wagner's behavior was deliberate, could have had a significant impact on the outcome of this case if not discovered, and was in disregard of his duties under Rule 11."[12] Thereafter, Attorney Wagner timely appealed to this Court.

**B**

**Standard of Review**

"'[W]hile a trial justice has discretionary authority to formulate what he or she considers to be an appropriate sanction,' we will reverse a sanction when it was imposed based on an erroneous view of the law,' or on a clearly erroneous assessment of the evidence." Manning v. Bellafiore, 139 A.3d 505, 515 (R.I. 2016) (quoting FIA Card Services, N.A. v. Pichette, 116 A.3d 770, 776 (R.I. 2015)). "Therefore, we will reverse an imposed sanction only if the trial

---

[12] After a motion to reconsider the amount of the monetary sanctions imposed on the basis of financial hardship, the court reduced the sanctions from $6,647 to $2,841.15.

justice has abused his discretion in imposing that sanction." Pleasant Management, LLC v. Carrasco, 918 A.2d 213, 217 (R.I. 2007) (citing Michalopoulos v. C & D Restaurant, Inc., 847 A.2d 294, 300 (R.I. 2004)).

**C**

**Analysis**

On appeal, Attorney Wagner challenges the sanctions imposed against him under Rule 11 for an allegedly misleading statement that was contained in the motion for entry of final judgment that he filed on March 3, 2014. He contends that the Superior Court's decision to impose sanctions was based on an erroneous assessment of the facts and an erroneous application of the law to those facts. Furthermore, he argues that, even if sanctions were warranted under the facts and law, the sanction imposed is not appropriate in view of the facts and circumstances of this case, is excessive when compared to previous Rule 11 decisions, and does not reflect the reasonable expenses incurred by Ferreira's counsel in responding to the allegedly misleading statement.

Rule 11 provides, in pertinent part, that:

> "every pleading, written motion, and other paper of a party represented by an attorney shall be signed personally by at least one (1) attorney of record * * *.
>
> "The signature of an attorney, self-represented litigant, or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry the pleading, motion, or other paper is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that the pleading, motion, or other paper is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. * * * If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, may impose upon the

- 34 -

person who signed the pleading, motion, or other paper, a represented party, or both, any appropriate sanction * * *.'"

"Under Rule 11, a trial justice has discretionary authority to formulate what he or she considers to be an appropriate sanction, but must do so in accordance with the articulated purpose of the rule: 'to deter repetition of the harm, and to remedy the harm caused.'" Pleasant Management, LLC, 918 A.2d at 217 (quoting Michalopoulos, 847 A.2d at 300). Furthermore, "[t]o comply with the requirements of Rule 11, counsel must 'make [a] reasonable inquiry to assure that all pleadings, motions and papers filed with the court are factually well-grounded, legally tenable and not interposed for any improper purpose.'" Id. at 218 (quoting Mariani v. Doctors Associates, Inc., 983 F.2d 5, 7 (1st Cir. 1993)). "[S]uch improper purposes may include efforts 'to harass or to cause unnecessary delay or needless increase in the cost of litigation.'" Burns v. Moorland Farm Condominium Association, 86 A.3d 354, 361 (R.I. 2014) (quoting Rule 11).

We have previously noted that "sanctions are a badge of reprobation that can haunt an attorney throughout his or her career * * * [and that the] ramifications * * * go far beyond the particular case." Plante v. Stack, 109 A.3d 846, 860 (R.I. 2015) (quoting In re Plaza–Martinez, 747 F.3d 10, 14 (1st Cir. 2014)). Accordingly, "[t]rial courts 'must take care in balancing these competing concerns' with the facts in the record, and when those facts do not support the stated grounds for punishment, the sanction should be vacated." Id. (quoting In re Plaza–Martinez, 747 F.3d at 14).

In Burns, 86 A.3d at 361, this Court vacated Rule 11 sanctions, holding that, "[e]ven though the trial justice disagreed with the [defendant], and even if the information contained in the report did not pass muster as newly discovered evidence, we nonetheless conclude that the motion had a factual foundation." Similarly, here, we believe that there is a plausible factual

foundation to conclude that Attorney Wagner's interpretation of the jury verdict summary sheet was reasonable. It seems to us that the responses to the jury interrogatories were susceptible to more than one reasonable interpretation. Indeed, the trial justice herself indicated that the jury "may have found as plaintiffs represent but not necessarily so[,]" and that "[a]ccordingly, [j]ury [i]nterrogatories 6, 11 and 13 permitted the jury to find trespass on an 'either' or 'both' basis." She added specifically that she "agree[d] [that they] w[ould] never know whether the jury thought that it was trespass just by water or whether it was trespass by water and depositing contaminants." It is our opinion that, because the jury verdict summary sheet lent itself to more than one reasonable interpretation and the interpretation of counsel fell within the bounds of reasonableness, the imposition of sanctions was not appropriate.

It is our opinion that, when he interpreted the jury's responses, Attorney Wagner made no efforts "to harass or to cause unnecessary delay or needless increase in the cost of litigation."[13] Burns, 86 A.3d at 361 (quoting Rule 11). The facts simply do not support the imposition of sanctions in the matter before us. Accordingly, we believe that the trial justice exceeded the bounds of discretion afforded to her. Consequently, we vacate the order imposing sanctions.

## VII

### Conclusion

For the reasons set forth above, we affirm in part, and vacate in part, the judgment of the Superior Court. The record shall be returned to the Superior Court.

---

[13] In considering whether Attorney Wagner acted improperly, we were struck by the fact that he attached a copy of the jury verdict summary sheet from this case to the mandamus complaint. This is an indication that Attorney Wagner was not attempting to mislead the court.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Louis Paolino et al. v. Joseph Ferreira et al. |
| **Case Number** | SU-14-0334-Appeal.<br>SU-14-0335-Appeal.<br>(PC 06-5973) |
| **Date Opinion Filed** | February 16, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Patricia A. Hurst |
| **Attorney(s) on Appeal** | For Plaintiffs:<br><br>Brian A. Wagner, Esq.<br>Ronald L. Bonin, Esq.<br><br>For Defendants:<br><br>Robert Clark Corrente, Esq. |